**Robert F. PARK, Plaintiff,**

v.

**Anthony J. CELEBREZZE, Secretary of Health, Education and Welfare, Defendant.**

**Civ. A. No. 1668.**

United States District Court
W. D. Arkansas,
Fort Smith Division.

Feb. 18, 1963.

**154**

Robert E. Irwin, Russellville, Ark., for plaintiff.

Charles M. Conway, U. S. Atty., Robert E. Johnson, Asst. U. S. Atty., Fort Smith, Ark., for defendant.

JOHN E. MILLER, Chief Judge.

This is an action by the plaintiff, Robert F. Park, to review a final decision of the defendant Secretary, denying the plaintiff's application for a period of disability and disability benefits as authorized by the Social Security Act, as amended, 42 U.S.C.A. §§ 416(i) (1), 423. This court has jurisdiction of the action pursuant to Sec. 205(g) of the Social Security Act, 42 U.S.C.A. § 405(g).

On September 27, 1960, plaintiff filed his application to establish a period of disability and his application for receipt of disability insurance benefits. The applications were subsequently denied, and the plaintiff thereafter requested a reconsideration of said denial. Upon reconsideration the Bureau of Old-Age and Survivors Insurance affirmed the denial of the applications, and the plaintiff thereafter requested a hearing before a hearing examiner. The hearing was conducted on October 17, 1961, and on December 28, 1961, the hearing examiner filed his decision denying the plaintiff's claim. Thereafter the plaintiff requested the Appeals Council to review the hearing examiner's decision, and on July 2, 1962, the Appeals Council denied plaintiff's request for review. The decision of the hearing examiner therefore became the final decision of the defendant Secretary.

The plaintiff filed the instant action on August 29, 1962, and in due time the defendant filed his answer. The case is now before the court on cross motions for summary judgment. Briefs have been received from both sides in support of their respective contentions and have been considered by the court.

The pertinent facts in this case are not in dispute. The plaintiff was born May 4, 1928, at Clarksville, Arkansas. His formal education consisted of completion of the ninth grade. He was first employed when he was 19 years old by the Ozark Hardwood Company as a laborer in the log yard for a period of eight months. He next worked in the hardwood flooring plant of the Galloway Lumber Company as an end matcher and operator of a knot saw for a period of six months. He was next employed by the Sparton Aircraft Company at Tulsa, Oklahoma, where he worked in the woodworking department as an operator of saws and moulding machines. He left this employment in September 1951 and went to Dodge City, Kansas, where he was employed by the Fairmont Food Company as a route salesman. After two years he quit his job with

Fairmont and went to work for the Western Light and Telephone Company in the appliance service and electrical department. During his employment with Western, he received on-the-job training and acquired skill in the repair of electric stoves, refrigerators and other electrical appliances. On July 8, 1954, while employed by Western he suffered a back injury when he fell down some steps while helping to carry a washing machine. As a result of this accident he suffered two herniated discs located in the fourth and fifth lumbar region. After this injury the plaintiff continued to work for Western as often as he was able, but he was bothered with increasing pain in his lower back which radiated into his left leg, causing extreme discomfort and loss of control of his left leg. On July 7, 1955, he underwent an operation in which two discs were removed and three vertebrae were fused in the same lumbar region of his back.

In 1956 he returned to Arkansas and opened a small electrical shop where he worked on appliances of all sizes. Even though the work was not strenuous, he had difficulty in bending over and lifting even small objects and could not sit at his work bench for any length of time. He had to close his shop a year later for lack of business, since he could not make service calls to repair larger electrical appliances which could not be easily removed to his shop. He then tried to do some farming in the summers of 1958 and 1959, but this sort of work proved to be much too strenuous and left him immobilized for days at a time.

In March 1960 he went to work for the Clarksville Machine Works in Clarksville, Arkansas, which employment he had obtained through his acquaintance with the manager and owner. The production foreman of the Machine Works also suffered from a back condition, and knowing of the plaintiff's similar condition, he made a special effort to work out an arrangement whereby the plaintiff could work as a machine operator without experiencing pain and difficulty.

During a four to five months period, plaintiff was assigned to various machines, the operation of which required either standing or sitting or a combination of both. Even though the production foreman found the plaintiff to be mentally alert and capable of learning quickly any given assignment, it was not possible to retain him because plaintiff could not remain in any one position for more than an hour or two, and often he would have to lie down or oven go home during the work day in order to relieve pain and discomfort which he experienced while operating any of the machines for more than an hour or two.

Plaintiff's present condition is summarized by the hearing examiner as follows:

"He received 90 percent disability from the Kansas Workmen's Compensation Commission, amounting to $11,620. He has no income at present. His wife works in the Circuit Clerk's office. They have six children, ages from 13 to 3 years old. He drives the car but testified that he has to stop often. At times he experiences difficulty in walking, although he can sometimes walk 2 or 3 blocks. At present he does not have to take anything for pain. On an average day he gets up at approximately 6:00 in the morning, eats breakfast, and just loafs around until he gets tired of it. He testified that he just piddles around home and town; that he quit hunting and fishing a year and a half ago; that he cannot watch television because of pain on sitting. He stated that he reads quite a bit in bed, lying on his back. He testified that normally his appetite is good if he is able to move around. He experiences some back pain at all times."

The medical report of Dr. Charles Rombold, dated December 29, 1960, indicates that the plaintiff was first seen in 1954 after he complained of a back injury suffered in July 1954. Dr. Rombold performed a spinal fusion on July

7, 1955, and he last examined the plaintiff on January 23, 1957. At that time plaintiff still complained of pain in his lower back and left leg, but no abnormal physical findings were made at that time. The X-ray report stated as follows: "The fusion series demonstrates no motion at either level of the fusion. The fusion mass posterior appears quite solid." The diagnosis was that the plaintiff had suffered a herniated nucleus pulposus which had been treated by the spinal fusion.

In a medical report dated March 17, 1961, Dr. W. E. Knight of the Holt-Krock Clinic, Fort Smith, Arkansas, indicated that he had examined the plaintiff on September 23, 1957, at the clinic. At that time the plaintiff was found to stand erect without any list to the right or left. He had no evidence of any atrophy of any of the muscles in either leg, and he was able to squat without any difficulty, sitting with his buttocks on his heels. With the plaintiff lying down, his straight leg raising was restricted bilaterally at about 45 degrees, which seemed to be due to "hamstring tightness," and not due to true sciatic irritation, the sciatic stretch signs being negative. At this time the plaintiff complained of pain at the lumbo-sacral junction on pressure, and there was some limitation of flexion of the lumbar spine. The report further indicates that the plaintiff could stand and bend over forward and touch his toes without bending his knees, but he did this by flexing at the hips and held his lumbar spine fairly rigid. Dr. Knight concluded the report by stating that he found no evidence of subsequent herniated disc, but that the plaintiff's complaints were due to lumbosacral instability. He recommended a low-back support and, if necessary, a lumbosacral fusion should be attempted again.

Dr. Guy Shrigley of Clarksville, Arkansas, is the plaintiff's family physician. He has treated the plaintiff from February 14, 1957, to the present time. His first report to the defendant was submitted on September 29, 1960, in which he recited the plaintiff's medical history, and diagnosed his condition as: "herniated intervertebral disc, lumbar (operated); lumbo-sacral instability." The subjective symptoms consisted of pain in the low back, with radiation down left leg; unable to perform any gainful operation due to extreme difficulty. The objective findings consisted of muscle spasm; a well healed scar in midline, lower back; and restricting in straight leg raising, tenderness in lumbo-sacral junction. The treatment consisted of injections, salicylates, physiotheraphy, heat application, and wearing of a lumbo-sacral support. As to specific restrictions on the plaintiff's activity, Dr. Shrigley stated as follows: "Patient is unable to be on his feet for any length of time in any sort of gainful employment; has attempted to work as an electrician and machinist." Dr. Shrigley submitted an additional report on December 13, 1960, which gives essentially the same information concerning the plaintiff's back besides an account of treatment of a bruised knee.

On March 15, 1961, plaintiff was examined by Dr. Hoyt Kirkpatrick of the Holt-Krock Clinic of Fort Smith, Arkansas. In his report dated March 20, 1961, Dr. Kirkpatrick indicates the same sort of findings of the previous medical reports with the exception that he differed with Dr. Knight's conclusion that sciatic signs were negative. Dr. Kirkpatrick concluded his report with the following statement:

"While I have no way of saying that Mr. Park does not have the severe degree of pain which he professes, I am unable to make out definite objective signs of disease at this time. It is my feeling that he has a post-fusion state together with some degree of fibrosis about the musculature of the low back."

On August 9, 1961, Dr. Shrigley submitted a report based on later examinations of the plaintiff, and it indicates that plaintiff continues to complain of pain in the lower back and is unable to pursue any gainful occupation. The

treatment of acute episodes of his low back pain has consisted of the usual salicylates, physiotherapy, heat, and wearing of the lumbo-sacral support.

On November 6, 1961, plaintiff underwent a consultative examination by Dr. John H. Adametz of Little Rock, Arkansas, a neurosurgeon, and his report dated November 17, 1961, reads in part as follows:

"On examination, the patient walked with a slight limp of his left leg. There was some slight increased lumbar muscle spasm, but there was no list of the lumbar vertebral column. There was a well healed, non-sensitive lumbar laminectomy scar in the lower lumbar area. He voluntarily limited straight leg raising on the left and complained of pain on palpation over the spinous processes of the lower lumbar spine, as well as the left calf. There was some loss of tone in the left calf. The left calf measured 29½ cm. in circumference, the right 30 cm. The left thigh measured 45 cm. in circumference, the right 46 cm. He limited forward bending to about 30 per cent of the expected normal and described sensory impairment over the medial aspect of his left foot. The knee jerks were equal and brisk. On the left, the ankle jerk was absent, as well as the posterior tibial reflex.

"There were some residual reflex changes, but one was unable to determine from a single clinical examination whether the atrophy and loss of tone in the left lower extremity were from actual nerve root compression or were more in keeping with the type of change one sees with disuse of an extremity.

"In order to better evaluate the patient's situation, a lumbar myelogram was done on November 8, 1961. Previous plain lumbar spine films showed that a laminectomy had been done at the L–4 – 5 interspace, with more of the lamina removed on the left side. There was a bilateral posterior spinal fusion done with a bone graft, and the upper margin of this graft appeared to be unfused. The lumbar myelogram showed a good flow of the contrast media throughout the entire lumbar subarachnoid space. There was no actual localized indentation or deformity in the myelographic column to show any ruptured intervertebral disc, either of a recurrent nature or of longstanding, and the only noted finding on the myelographic study was a slight degree of irrgularity around the L–4 – 5 nerve root on the left, which one would expect as a postoperative residual. Otherwise, the lumbar myelogram was entirely normal.

"The patient remained in the hospital for recovery from this procedure, and while he was convalescing from the myelogram, I started him on a program of physiotherapy, since I felt that with actual exercise this patient could be rehabilitated so that he could return to regular employment. The patient does possess a certain degree of residual disability as a result of his ruptured disc, but there are certainly many types of employment that he could engage in. I would estimate his permanent disability to be in an amount no greater than 15 percent to the body as a whole."

Since the date of the hearing, the plaintiff has been reexamined by Dr. Shrigley, and in a report dated April 19, 1962, he made the following statement:

"The patient now complains of recurrent pain in the low back region with radiation down both legs. He is unable to perform any type of gainful occupation due to extreme pain and tenderness. He has physical findings of muscle spasm, well healed scar, midline, lower back, with restriction of straight leg raising and tenderness in the lumbosacral junction, being consistent with findings of lumbo-sacral insta-

bility and possible herniated intervertebral disc, operated. This patient has been seen by various doctors on several occasions; the Holt-Krock Clinic of Fort Smith, Arkansas, having checked him in 1961. He continues to complain of low back pain, and has been seen at irregular intervals for treatment of acute episodes of low back pain, which consisted of salicylates, physiotherapy, heat and wearing of a lumbosacral support.

"Final diagnosis: herniated intervertebral disc, lumbar, operated, . with lumbo-sacral instability, which is the cause of recurrent attacks of muscle spasm and pain, especially on exertive work."

The hearing examiner summarized his findings with the following:

"* * * The claimant has had one spinal operation for a fusion at the L–4 – L–5 level, and several months following this surgical procedure again started experiencing pain, which he contends has continued to date. Since the date of his operation, the claimant has engaged in several periods of employment but contends that he had to discontinue them because of his back condition. He is trained as an electrical appliance repairman. While some types of electrical appliances, such as washing machines, stoves, and dryers, might require the worker to move the appliances, there are a number of light appliances which the claimant could repair without having to perform any heavy lifting. Also, consideration is given to the latest medical evidence of record, which as stated previously is Exhibit No. 23 to the record and is a report of consultative examination. This report shows that a myelogram study was performed, which indicated that the claimant was not suffering from a ruptured intervertebral disc at this time, either of a recurrent nature or of long-standing, and that the

myelogram study was entirely normal. It is here recalled that this examining doctor prescribed a course of physiotherapy for the claimant which would enable him to return to some type of substantial gainful activity commensurate with his overall ability to work.

"While the claimant, because of his back condition, could not engage in work of a hard strenuous nature, where heavy lifting or constant movement or bending would be required, it is not established that because of the back condition his overall condition has deteriorated to the point that he would be unable to engage in any type of substantial gainful activity or that his back condition would be of long-continued and indefinite duration.

"It is, therefore, the finding of the Hearing Examiner that the claimant has failed to establish that he is or has been continuously under an impairment or combination of impairments of such severity as would preclude him from engaging in some type of substantial gainful activity."

The plaintiff has met the special earnings requirements for disability purposes as of the date he alleged his onset of disability. The earnings record shows that the plaintiff continued to meet such special earnings requirements through the calendar quarter ending June 1962.

The only issue before the court upon the record is whether there is substantial evidence in the record to support the decision of the Secretary that plaintiff failed to establish that he was entitled to a disability freeze or to monthly disability insurance benefits as of the date of his alleged onset of disability.

■■ The burden of proof is upon the plaintiff. Not only are the findings of fact made by the hearing examiner, if supported by substantial evidence, conclusive, but a majority of courts also extend the finality of the hearing examiner's findings to inferences and con-

clusions which he draws from the evidence if there is substantial basis for the conclusion. The hearing examiner's conclusions of law, however, are not binding upon the court, although they are entitled to great weight. In reviewing the decision of the hearing examiner, this court must not abdicate its conventional function. Blanscet v. Ribicoff, (W.D.Ark.1962) 201 F.Supp. 257; Morris v. Ribicoff, (W.D.Ark.1961) 194 F. Supp. 841; Harmon v. Ribicoff, (W.D. Ark.1961) 192 F.Supp. 743. The court's function in a review of this nature was succinctly summarized in Lewis v. Flemming, (E.D.Ark.1959) 176 F.Supp. 872, at page 874, when the court said:

"In an action of this kind, judicial review should go no further than to determine whether findings made by the administrative fact finder are supported by substantial evidence and whether applicable principles of law have been correctly applied to the facts. Arbitrary or capricious action must be set aside, and, of course, a finding or conclusion based upon an erroneous view of the law cannot be sustained."

The meaning of the term "substantial evidence" and the application of that term by the court is, of course, of paramount importance in a determination of this case. The meaning and application of the "substantial evidence" test in Social Security cases have been subject to discussion in several recent cases.

In Wray v. Flemming, (W.D.Ark. 1960), 181 F.Supp. 783, this court adopted the definition of substantial evidence as found in 4 Davis, Treatise on Administrative Law, Sec. 29.02, at page 118, as follows:

"In recent decades the principal guide to the meaning of substantial evidence has been a Supreme Court statement written by Chief Justice Hughes: 'Substantial evidence is more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'

[Consolidated Edison Co. [of New York] v. N. L. R. B., 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938).] A later statement clarifies further: Substantial evidence 'means evidence which is substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred. * * * [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.' [N. L. R. B. v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939).]"

See, also, Blanscet v. Ribicoff, supra; Morris v. Ribicoff, supra; Harmon v. Ribicoff, supra.

Disability is defined in 42 U.S.C.A. §§ 416(i) (1) and 423(c) (2), as meaning:

"* * * inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration * * *."

The Social Security Administration characterizes the requirement of an indefinite duration in 20 C.F.R., Sec. 404.-1502(f), 42 U.S.C.A.Appendix, as follows:

"Under the law, an impairment must also be expected either to continue for a long and indefinite period or to result in death. Indefinite is used in the sense that it cannot reasonably be anticipated that the impairment will, in the foreseeable future, be so diminished as no longer to prevent substantial gainful activity."

In 20 C.F.R., Sec. 404.1510 (Supp. 1962), the Administration utilizes the following medical factors in determining the effect of impairments:

"(a) In order to establish that a medically determinable physical or

mental impairment (see § 404.1501 (a) or (b) (1)) is present there should be evidence that medically discernible anatomical, physiological, biochemical or psychological aberrations exist. Allegations of inability to work as a result of impairment such as dyspnea (shortness of breath), pain, lack of musculoskeletal function, decreased vision or hearing, decreased memory, etc., should be shown to result from structural, physiological or psychological changes which can be identified by the use of clinical and laboratory diagnostic techniques. An alleged impairment is medically determinable only if it can be verified by the use of clinical and laboratory diagnostic techniques.

"(b) The medical evidence should be complete enough to support an independent diagnostic, therapeutic and prognostic conclusion by the State agency or the Social Security Administration, as the case may be, and form a clear picture of the individual's functional limitations (e. g., where dyspnea (shortness of breath) is reported, the level of activity at which it occurs should be described). The impairment should be described etiologically (cause), pathologically (structural change), physiologically (functional), psychologically, and therapeutically (treatment and response).

"(c) In determining the severity and expected duration of an impairment, consideration is given to:

\*　\*　\*　\*　\*　\*

"(2) The extent to which the disease interferes with the ability of all body systems to contribute their share to the individual's capacity for walking, sitting, standing, bending, remembering, seeing, speaking, hearing, manipulating and maintaining interpersonal relationships; \* \* \*."

In 20 C.F.R., Sec. 404.1511, the impairments involving the musculoskeletal system applicable to the present case are set forth as follows:

"(a) General. In determining the effect of impairments involving the musculoskeletal system consideration is given to the effect of the impairment on the normal movements involved in working for a living. The principal factors considered are:

"(1) Remaining capacity for weightbearing, walking, standing, sitting, stooping, grasping, lifting, reaching, and bending;

"(2) The ability to perform gross or fine manipulative movements of arms, hands and fingers;

\*　\*　\*　\*　\*　\*

"(4) The ability to wear and use prosthetic devices;

"(5) The ability to coordinate;

"(6) The presence of severe pain; and

"(7) Loss of strength."

The first question to be determined is whether the plaintiff is afflicted with a medically determinable physical impairment which can be expected to continue for a long and indefinite period of time, and which is of such magnitude as to qualify under the applicable statutes and regulations heretofore set forth.

In this connection, the medical evidence is conclusive that the plaintiff's back and leg pain has existed since 1954 when he suffered two herniated discs in the lumbar region of his back as a result of a fall, while employed by Western Light and Telephone Company in Dodge City, Kansas.

The medical evidence further shows that he underwent a spinal fusion operation in 1955 and since then he has suffered post-operative pain due to lumbosacral instability. However, the hearing examiner is not of the opinion that plaintiff's affliction will continue for a long and indefinite period of time. He apparently bases his conclusion on Dr. Adametz' speculation that the plaintiff

could be rehabilitated by a program of physiotherapy.

The court is of the opinion that the hearing examiner's conclusion was not supported by substantial evidence. In the first place, Drs. Knight, Kirkpatrick and Shrigley state in their reports that if the plaintiff is to gain any permanent relief, he must undergo a second spinal fusion operation. None of these doctors suggested the possibility of plaintiff's rehabilitation or cure through physiotherapy. In the second place, plaintiff in his request for review dated February 18, 1962, stated that as a result of undergoing Dr. Adametz' physiotherapy program while hospitalized in Little Rock, he was unable to tie his own shoe laces, became bedfast for several days, and had to be treated by Dr. Shrigley.

In other words, plaintiff's back condition is of such a nature that, in the opinion of competent and experienced orthopedic surgeons, it can be corrected only by major surgery. The hearing examiner did not specifically deny plaintiff's disability because he has not undergone the second spinal fusion operation in fulfillment of 20 C.F.R., Sec. 404.-1502(g), which states:

"An individual will be deemed not under a disability if, with reasonable effort and safety to himself, the impairment can be diminished to the extent that the individual will not be prevented by the impairment from engaging in any substantial gainful activity."

Even if the plaintiff had refused to undergo such an operation, he could not be denied disability on that factor alone. In the case of Martin v. Ribicoff, (E.D. Tenn.1961) 195 F.Supp. 761, which dealt with a back condition similar to that of plaintiff's, the court, beginning at page 772, stated:

"We cannot say, from the proof in this record, that plaintiff can diminish his impairment to the extent that he 'will not be prevented by the impairment from engaging in any substantial gainful activity' by 'rea-

sonable effort and safety to himself'. We are satisfied that plaintiff, like many others, has great fear of an operation; he, in good faith, believes he has only a 50–50 chance of recovery, and that an operation might cause him to become a wheelchair invalid. He was advised by some of the doctors that if he didn't submit to the operation that his pain might become continuous and so bad that he would be driven to an operation in order to get relief. In the light of this information, he couldn't persuade himself to have an operation.

"We do not believe that the above-quoted regulation of the Social Security Administration required plaintiff to submit to an operation under the circumstances in the record. If such regulation did require plaintiff to submit to an operation, this would raise the question as to whether the regulation was valid as being within the framework of the Act.

"Plaintiff's position in the matter may be different from the majority of patients in like situations, but this Court believes that there is a sizeable minority that holds to a like view. There are some who will not undergo major operations. Others will undergo major operations only as a last resort to prevent death.

"The Social Security Act is humanitarian legislation and we do not believe that it requires a sincere person who has great fear to submit to an operation in an effort to diminish his impairment in order to have a disability period established.

\* \* \* \* \* \*

" \* \* \* This case, and others along this line, is authority for the rule that a person suffering from a disease who refuses to take medicine which may cure the disease either in whole or in part, is not disabled to carry on gainful activities, may be distinguished on the

facts from the present case as there is a wide difference in taking medicine for the cure of a disease that causes disability and in undergoing major surgery for the removal of the impairment that causes disability.

"In the case of the disease, the patient has all to win and nothing to lose; whereas, in the case of the ruptured intervertebral disc requiring major surgery, there is a possibility of the patient losing all and gaining nothing."

Furthermore, the hearing examiner has placed undue reliance on Dr. Adametz' report which also discredits the magnitude of plaintiff's back pain because he made no objective findings of spinal cord and nerve root pressure or compression. Not only are the other physicians unanimous in their objective findings that the plaintiff suffers from lumbo-sacral instability, but their subjective findings of severe pain are amply supported by plaintiff's restriction of movement and regular occurrences of muscle spasms. In other words, the findings of the hearing examiner are not supported by substantial evidence when he relies on isolated remarks in one or two of the medical reports before him. Corn v. Flemming, (S.D.Fla.1960) 184 F.Supp. 490.

As stated above in 20 C.F.R., Sec. 404.1511(a) (Supp.1962), where there are impairments involving the musculoskeletal system, the medical factor of severe pain may be taken into consideration in order to determine the extent of the impairment. The fact that there is such a subjective symptom as pain does not mean that it ranks as a lesser type of disability. In the case of Lewis v. Flemming, 176 F.Supp. 872, (E.D.Ark.1959), Judge Henley on page 876 stated:

"There is nothing in the statute or the legislative history which indicates a Congressional intent to exclude disability caused by pain, as contrasted to other types of disability, such as disability resulting from loss of limbs or sight or from mechanical disfunction of the limbs, joints, or other organs of the body. As a matter of fact, common experience and observation teach that in many cases of disability pain in one form or another is the chief and immediate disabling agent. An individual's body may be mechanically capable of use and function, but the pain resulting therefrom may be so great as to preclude them. Indeed, the nervous system in an effort to avoid agonizing pain may in effect impose immobility and inactivity upon the person affected; and in such a case the disability is no less real than it would be if the patient had lost the mechanical use of his body."

See, also, Blanscet v. Ribicoff, supra, at page 261 of 201 F.Supp.

The point is that plaintiff's history—the surgical removal of two herniated discs and the fusion of three vertebrae and the postoperative state of lumbo-sacral instability and severe back and leg pain, from a medical standpoint, is a recognized physical impairment which can be determined by approved laboratory and clinical observation and will continue for an indefinite duration unless corrected by major surgery. From a legal standpoint plaintiff's impairment is considered a permanent disability whether or not he consents to undergo a corrective operation. Therefore, it is the opinion of this court that plaintiff's affliction with lumbo-sacral instability and resulting back and leg pain is a serious physical impairment of indefinite duration and the conclusion of the hearing examiner to the contrary is not supported by substantial evidence.

Granted that the plaintiff is afflicted with a physical impairment of a serious nature, the next question is whether he is able to engage in substantial gainful activity within the provisions of the applicable statutes and regulations.

The court in the case of Randall v. Flemming, (W.D.Mich.1961) 192 F.Supp. 111, compiled a great number of decisions which had analyzed the requirements of the above statutes and regulations, and it summarized them as follows at page 123:

> "To summarize, the courts have generally agreed that the test of a claimant's disability or inability to engage in any substantial gainful activity is a subjective one, that is, what is reasonably possible in the light of the plaintiff's physical and mental capacities and his education, training, and experience. It is not necessary that the plaintiff establish the complete absence of any opportunity for substantial gainful employment; he need only establish that he has become disabled from employment in any work or vocation in which he could profitably seek employment in the light of his physical and mental capacities and his education, training, and experience. Furthermore, it is clear that a plaintiff need not be totally helpless or bedridden in order to be considered disabled under the Social Security Act."

In this connection the case of Ellerman v. Flemming, (W.D.Mo.1960) 188 F. Supp. 521, warrants consideration for its analysis of the relative burdens of proof. In Ellerman, Chief Judge Ridge said at page 527:

> "Under the Social Security Act, unlike some other statutes, it is not the burden of the claimant to introduce evidence which negatives every imaginable job open to men with his impairment, and of his age, experience and education. It is quite enough if he offers evidence of what he has done, of his inability to do that kind of work any longer, and, of his lack of particular experience for any other type of job. If there are other kinds of work which are available and for which the claimant is suited, it is the defendant's bur-den to adduce some evidence from which a finding can be made that he can do some type of work; actually, not apparently. Parfenuk v. Flemming, D.C.Mass.1960, 182 F.Supp. 532."

See, also, Hawkins v. Celebrezze, (W.D. Ark.1962) 210 F.Supp. 341; Sebby v. Flemming, (W.D.Ark.1960) 183 F.Supp. 450; Dunn v. Flemming, (W.D.Ark. 1958) 166 F.Supp. 44.

The hearing examiner apparently failed to give any consideration as to the manner in which plaintiff's impairment affected him as an individual in his quest to secure and perform work which could be classified as substantial gainful activity; yet the transcript is replete with disinterested lay testimony by former supervisors and fellow employees to the effect that since the date of his injury in 1954, plaintiff has made a sincere and continuing effort to seek employment in a line of work which he could perform without being overcome by severe pain in his lower back and left leg. In each case plaintiff's ability to repair electrical appliances and to operate machinery was considered to be equal or superior to that of his fellow workers, but since he could not work more than an hour or two at a time without experiencing severe pain, his employers have had to discharge him. Also, when the plaintiff attempted self-employment in the repair of small electrical appliances and light farming, he could not carry on his own work without experiencing severe pain.

█ The hearing examiner concludes that plaintiff has failed to establish that he has been continuously under a physical impairment of such severity as would preclude him from engaging in some type of substantial gainful activity, yet the record is conclusive that the plaintiff is physically unable to pursue any activity which is light enough not to affect his back which at the same time is substantial and gainful as steady employment. As stated in the case of Corn v.

Flemming, supra, at page 494 of 184 F.Supp.;

> "* * * Mere abstract speculation by the Referee or Appeals Council as to a possible avenue of employment for a claimant is not 'evidence' which a claimant should be required to refute; if it were, disability would become a meaningless word."

The hearing examiner and the defendant in his brief apparently take the position that pain, no matter how severe, is not disabling unless work does "more than hurt" so that it substantially aggravates plaintiff's impairment. This attitude has been discredited by recent court decisions, as in the case of Butler v. Flemming, (5 Cir., 1961) 288 F.2d 591, in which Judge Brown stated at page 595:

> "* * * Perhaps it is true that history teaches that 'A man may have to endure discomfort or pain and not be totally disabled; much of the best work of life goes on under such disabilities * * *.' But the purpose of much social security legislation is to ameliorate some of these rigors that life imposes. Congress has in effect stated that if a person is unable except under great pain to engage in any substantial gainful activity in which he might be employable, taking into consideration his age, training, work experience and physical and mental capacities, he shall be deemed to be disabled for the purposes of this Act."

See also: Kerner v. Flemming, (2d Cir., 1960) 283 F.2d 916; Flemming v. Booker, (5th Cir., 1960) 283 F.2d 321.

Based upon the complete record before the court, including the nature of plaintiff's physical impairment, together with his inability to employ his training, education and skill in substantial gainful activity, the court is convinced that the plaintiff sustained his burden of proving disability and a period of disability as defined in the Act, and that the conclu-sions of the hearing examiner and the Appeals Council to the contrary were not based upon substantial evidence or upon a proper application of the governing law.

Therefore an order is being entered today in accordance with this opinion, granting the plaintiff's motion for summary judgment, denying the defendant's motion, and reversing and remanding the case to the defendant Secretary with directions that the plaintiff be granted a period of disability and disability benefits in accordance with his application.