**Alta B. HALL, Plaintiff,**

v.

**Anthony J. CELEBREZZE, Secretary of Health, Education, and Welfare, Defendant.**

**No. C-216-G-62.**

United States District Court
M. D. North Carolina,
Greensboro Division.

March 19, 1965.

H. Vernon Hart, Greensboro, N. C., for plaintiff.

William H. Murdock, U. S. Atty., and R. Bruce White, Jr., Asst. U. S. Atty., Greensboro, N. C., for defendant.

EDWIN M. STANLEY, Chief Judge.

The plaintiff seeks judicial review, pursuant to § 205(g) of the Social Security Act, as amended, 42 U.S.C.A. § 405(g), of the final decision of the Secretary of Health, Education, and Welfare, denying her the establishment of a period of disability and disability insurance benefits.

The plaintiff first filed her application to establish a period of disability and for disability insurance benefits on December 13, 1960, alleging that she first became unable to work on October 1, 1958, because of a back injury. When the application was disallowed, the plaintiff requested a hearing before a hearing examiner. The requested hearing was held on June 19, 1962, before Hearing Examiner Ben D. Worcester. The plaintiff was not represented by counsel at this hearing.

On June 22, 1962, the Hearing Examiner rendered his decision, holding that the plaintiff had not established that she had impairments, either singularly or in combination, of such severity as to preclude her from engaging in any substantial gainful activity at any time for which her application of December 13, 1960, was effective, and that she was not entitled to disability insurance benefits or to a period of disability. When the Appeals Council denied plaintiff's request for review, the decision of the Hearing Examiner became the final decision of the Secretary.

On November 9, 1962, the plaintiff brought this action to obtain judicial review of the final decision of the Secretary, following which the parties cross-moved for summary judgment. After considering the motions, briefs and supporting documents filed in support of and in objection thereto, and the transcript of the record of proceedings before the Secretary, the Court, on June 19, 1963, filed its Memorandum Opinion, D.C., 217 F.Supp. 905, wherein it was concluded that there was no substantial evidence before the Secretary to support his findings, unless the condition of the plaintiff was remediable, and that a final decision on the merits of plaintiff's claim should be deferred until there had been an opportunity to present further evidence concerning the nature, extent and duration of her disability, and the employment opportunities available to her. An order was thereupon entered remanding the cause to the Secretary for taking additional evidence in accordance with § 205(g) of the Social Security Act, 42 U.S.C.A. § 405(g).

The hearing on remand was held on November 12 and November 22, 1963, before Hearing Examiner Albert C. Osofsky. Plaintiff was represented at this hearing by her present counsel. On December 20, 1963, Hearing Examiner Osofsky rendered his recommended decision, holding that plaintiff had failed to establish impairments of such severity as to preclude her from engaging in any substantial gainful activity, and recom-

mending that she not be awarded a period of disability or disability insurance benefits under §§ 223(a) and 216(i) of the Act. The Appeals Council thereafter reviewed the recommended decision of Hearing Examiner Osofsky and, on March 31, 1964, rendered its decision, adopting and approving the recommended decision of the Hearing Examiner. Thus, the decision of the Appeals Council has now become the final decision of the Secretary.

After the matter was returned to this Court for judicial review of the proceedings before the Secretary, the defendant filed a transcript of the supplemental record of proceedings, and the matter is once again before the Court on cross-motions for summary judgment.

The issue for decision before the Secretary was stated by Hearing Examiner Worcester as follows:

"The issues are dependent upon specific findings as to whether during the effective period of the application, filed December 13, 1960, and while the special earnings requirements were met, the claimant was under a disability in that she was unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration and, if so, the beginning date of such disability. The claimant met the special earnings requirements during the effective period of the application, and continues to meet such requirements through December 31, 1961. Thus, on the basis of her application filed on December 13, 1960, the evidence must establish that the claimant was under a disability as defined in the Act beginning on or before March 1, 1961, for entitlement to disability insurance benefits, and on or before March 13, 1961, for establishment of a period of disability."

The issue before this Court is the substantiality of the evidence to support the

Secretary's findings on the issues before him. In Thomas v. Celebrezze, 4 Cir., 331 F.2d 541 (1964), the prescribed standard for judicial review is clearly set out by Chief Judge Sobeloff as follows:

"The prescribed standard of review, found in section 205(g) of the Act, 42 U.S.C.A. § 405(g), is as follows: '* * * The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive, * * *.' Substantial evidence has been defined innumerable times as more than a scintilla, but less than preponderance. Consolidated Edison Co. v. N. L. R. B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938). The Secretary, and not the courts, is charged with resolving conflicts in the evidence, and it is immaterial that the evidence before him will permit a conclusion inconsistent with his. Snyder v. Ribicoff, 307 F.2d 518, 520 (4th Cir. 1962). If his findings are supported by substantial evidence, the courts are bound to accept them. Underwood v. Ribicoff, 298 F.2d 850 (4th Cir. 1962). In short, the courts are not to try the case de novo. At the same time, they must not abdicate their traditional functions; they cannot escape their duty to scrutinize 'the record as a whole' to determine whether the conclusions reached are rational. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Boyd v. Folson, 257 F.2d 778 (3d Cir. 1958); 4 Davis, Administrative Law (1958) § 29.02, pp. 118–126. If they are, they must be upheld; but if, for example, reliance has been placed upon one portion of the record to the disregard of overwhelming evidence to the contrary, the courts are equally bound to decide against the Secretary. Park v. Celebrezze, 214 F. Supp. 153 (W.D.Ark.1963); Corn v. Flemming, 184 F.Supp. 490 (S.D. Fla.1960). In such a circumstance the courts are empowered either to modify or reverse the Secretary's decision 'with or without remanding the cause for a hearing.' 42 U.S. C.A. § 405(g)."

The plaintiff is now 54 years of age. She has a seventh grade education and has worked in textile mills and veneer plants off and on since she was 13 years of age, either as a winder, spool-tender, machine helper, or boarding socks. She claims that she became unable to work on October 1, 1958, when she was 47 years of age, because of a back injury sustained while working at Pickett Cotton Mills, High Point, North Carolina.

At the hearing before Hearing Examiner Worcester on June 19, 1962, the plaintiff described the injury she received to her back on the night of October 1, 1958, while moving heavy crates, and her subsequent examination and treatment by many doctors in a number of cities over a period of several months. After the Hearing Examiner stated that the evidence failed to support a finding of a permanent impairment, the plaintiff commented:

"If anybody can find me a job I can do, I'm willing to take any kind of a job. And if I could work, I'd go to work. I've worked all my life and I'm not sittin' around a sufferin' and not sleepin' at nights * * * I can't even stand on my feet long enough to wash my dishes and I can't do my work. And if anybody don't believe it, they can come to the house and see it and if you want to hire somebody to come and stay with me and see for themselves. They don't have to take my word for it 'cause I'm tellin' the truth and I'm not trying to git somethin' for nothin'. I never have been a person to do somethin' like that. I'm absolutely not able to work and I couldn't work if somebody was standin' over me with a gun. I'd just tell 'em to go ahead and shoot. That's the very word I'd tell 'em. Nobody knows what I suffer but me and I tell my husband every day or two, I'd just be as good off dead as I am a livin', because I'm no good to

myself or my family either and I can't help what the doctor says, I know my own feeling. I know my sufferin'. One person don't know what another person suffers."

The plaintiff then went on to relate that a short time later she returned to work at the Pickett Cotton Mills for about one week, but that she "couldn't make it" because she suffered so much pain. She further stated that she was unable to dress herself, get in or out of the bath tub, or do much of the household work. She impressed the Hearing Examiner as being an "honest, truthful and sincere person."

Several medical reports were received in evidence at the hearing before Hearing Examiner Worcester in 1962. Dr. Robert C. Johnston reported that he had treated the plaintiff between October 1, 1958, and March 6, 1959, with symptoms of low back pain. He found multiple tender areas in the lumbosacral region of her back. An x-ray of plaintiff's spine on February 20, 1959, showed slight hypertrophic arthritis. Dr. Johnston was of the opinion that plaintiff had hypertrophic arthritis of the spine and a chronic low back sprain, with an acute episode on October 1, 1958. He described her condition as static and advised against heavy lifting or excessive bending.

During the latter part of 1959, the plaintiff was examined at the Baptist Hospital in Winston-Salem, North Carolina. There was no objective evidence of either nerve root compression or disc protrusion. It was recommended that she refrain indefinitely from heavy lifting and bending due to her history of back strain. Dr. Frederick Bergen, a neurosurgeon, reported the impression that the plaintiff suffered from a possible herniated disc at Region L4, L5.

On April 1, 1961, Dr. Richard H. Ames, a neurosurgeon, reported that he was well satisfied that the plaintiff had a chronic recurrent disc at the fourth interspace on the left side, and that surgery was the only form of definitive treatment he could offer. Dr. Ames did not advise

surgery, but stated the plaintiff alone would have to make the decision.

On August 21, 1961, Dr. W. G. Smith reported that he had treated plaintiff periodically since 1958 for low back pain, and that her response to therapy had been very poor. He stated that no improvement could be expected, and the plaintiff was unable to work due to her back. Again on June 18, 1962, Dr. Smith reported that plaintiff's condition had become worse and that, in his opinion, she would be troubled with the condition "from now on," which would render her unable to do any work. On August 2, 1962, Dr. Smith further reported that as the plaintiff advances in age her heart condition will become worse, and that the rheumatoid arthritis which had "involved all large joints of the body along with the spine is also a progressive disease."

Upon the foregoing record, Hearing Examiner Worcester found that the plaintiff was not suffering from a disability within the meaning of the Act, and this Court, in its Memorandum Opinion of June 19, 1963, observed:

"On the basis of the entire record, including the objective medical evidence, and the substantial subjective evidence of incapacity, all of which is uncontradicted, and considering the work history, education, age and experience of the plaintiff, the Court is unable to sustain the finding that the plaintiff is capable of engaging in substantial gainful activity."

At the remand hearing conducted by Hearing Examiner Osofsky on November 12 and November 22, 1963, the testimony of the plaintiff and her husband, William B. Hall, Dr. Richard C. Proctor, Dr. Edwin H. Martinat and Jerry Dee Cooper was taken. Other medical reports were also placed in the record.

Dr. Richard C. Proctor, a specialist in psychiatry and a member of the faculty of Bowman Gray School of Medicine, testified that he examined the plaintiff on September 25, 1963, at the request of North Carolina Department of Public Welfare. His diagnosis was:

"Conversion reaction, mixed type, manifested by numerous somatic complaints, referrable to many organ systems without much evidence of organic pathology, in a basically immature individual with limited intellectual capacity."

Dr. Proctor considered the plaintiff's prognosis to be "quite poor." He expressed the opinion that plaintiff's psychiatric impairment would preclude her from accepting employment, because an individual in her condition would be "incapable of functioning at a remunerative job." Dr. Proctor went on to state that an individual such as the plaintiff may be capable of doing housework, and at the same time be unable "to function in outside employment." He was unable to express an opinion as to her condition, or her ability to engage in remunerative employment, during the period from 1958 to 1961.

Dr. Edwin H. Martinat, an orthopedic surgeon connected with the Bowman Gray School of Medicine, stated that he also examined the plaintiff on September 26, 1963, at the request of the North Carolina Department of Public Welfare. His examination was a limited one due to the fact that the plaintiff declined to have further x-rays made of her back. The reason she gave for not wanting further x-rays made was that another doctor had told her that it would be dangerous. Dr. Martinat found some limited motion in plaintiff's lumbar spine, and a one-half inch shortness of the left lower extremity. He went on to explain that plaintiff was restricted in her back motion to 30 degrees, and that the shortness of her left lower extremity could give her an unbalance which could lead to some low back trouble. He expressed the opinion that plaintiff's condition, as disclosed by his limited examination, would be remediable in a majority of cases, and that, speaking in generalities, a herniated disc was also a remediable condition. However, not having the advantage of x-rays, Dr. Martinat was unable to state whether he would advise an operation for the plaintiff. He further stated that it was possible for the plaintiff to be suffering from "severe back pain and back trouble," and that the condition would not be revealed by x-rays or other objective evidence. And finally, Dr. Martinat stated that he did not have enough information on the plaintiff to express an opinion with any degree of accuracy as to whether she was physically able to engage in any type of strenuous activity involving her back.

On November 22, 1963, at the remand hearing, the plaintiff testified that she had been unable to do any work since her injury in 1958, and was unable to go to church or visit her children. William B. Hall, the plaintiff's husband, testified that since the plaintiff was injured he had done most of the laundry, the "biggest part" of the shopping, and that his wife had difficulty at times in even dressing herself. He further stated that his wife had complained since the date of her injury of soreness and pain in her back and legs, had frequently visited various doctors, and that a "little cooking" was about the only thing she was able to do.

The only other significant medical evidence placed in the record at the remand hearing were reports by Dr. Basil M. Boyd, Jr., Dr. Courtland H. Davis, Jr., and Dr. J. F. Register, and additional reports by Dr. W. G. Smith.

Dr. Boyd, an orthopedic surgeon, reported that from an examination of the plaintiff on March 19, 1960, he gained the impression that she was suffering from a "ruptured intervertebral disc L–5 left." The plaintiff was admitted on that date to the Charlotte Memorial Hospital for a period of conservative treatment. She was discharged on April 2, 1960, after having responded to traction and physical therapy. While a lumbar myelogram performed on March 28, 1960, was negative, Dr. Boyd stated he still believed the plaintiff was suffering from a "sprain of her lumbosacral spine superimposed upon a degenerative disc." He did not feel that the condition was operative at that time. The plaintiff was back to see Dr. Boyd on April 30, 1960, still suffering with "a good bit of pain."

On November 11, 1959, Dr. Courtland H. Davis, Jr., a neurosurgeon and a member of the faculty of the Bowman Gray School of Medicine, reported that his examination failed to reveal any objective evidence of either nerve root compression or disc protrusion. Upon the assumption that plaintiff was suffering from a back strain, he recommended against heavy lifting and bending indefinitely. However, on November 28, 1959, Dr. Davis reported the impression of a "herniated disc, L4, 5."

On April 9, 1959, Dr. J. F. Register, an orthopedic surgeon, reported that x-rays of the lumbar spine showed no evidence of any injury or disease, but that he was "unable to make out a great deal of objective findings" on the plaintiff. Dr. Register concluded by stating that he did not believe he could make any definite diagnosis, unless the plaintiff had some strain of the lower lumbar muscles.

On January 4, 1963, Dr. W. G. Smith, in reporting the results of another physical examination of the plaintiff, stated that her large joints were involved with arthritis and were very sore and tender. The diagnosis was "myocarditis with ascites and arthritis of spine involving the larger joints of the body." Again, on September 11, 1963, Dr. Smith reported that the plaintiff was suffering from generalized arthritis and that her condition would never improve.

The remaining evidence before the Hearing Examiner was the testimony of Jerry Dee Cooper, who testified with respect to job opportunities available to the plaintiff. Mr. Cooper received an M.S. Degree in Rehabilitation Counseling at the University of West Virginia on May 30, 1962, and since June 25, 1962, has been employed by Goodwill Industries Rehabilitation Center, Winston-Salem, North Carolina, as Supervisor of Personnel Training and Evaluation. He testified that he had read the transcript of testimony taken on June 19, 1962, and the testimony of Drs. Proctor and Martinat given on November 12, 1963, and, based on this testimony, together with information concerning the age, education, training and experience of the plaintiff, was of the opinion that the plaintiff was physically able to work from October 18, 1958, through March 13, 1961. He explained that even if the diagnosis made by Dr. Proctor was present during the critical period, he was still of the opinion that the plaintiff could have worked. This opinion was based on certain information the witness had acquired by reading from a publication entitled "American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders." By using a Dictionary of Occupational Titles published by the United States Department of Labor in 1956, describing some 40,000 jobs, Mr. Cooper was of the opinion that, during the period mentioned, the plaintiff was capable of making the final inspection of knitted stockings, reinspecting men's stockings, sewing decorative or reinforcing cross-stitches around the neck or down the front of a knitted garment, trimming cloth, marking grey goods or sorting rags in the textile industry, or performing the service of a "bagger" in either the clothing or baking industry. On cross-examination, Mr. Cooper testified that he had never seen the plaintiff before that day, and was mindful of the fact that his evaluation of the plaintiff's physical condition was at variance with the diagnosis made by Dr. Proctor. He stated he did not know whether any of the job classifications mentioned were available to the plaintiff, and that the only purpose of his testimony was to establish that they were available in the vicinity of where the plaintiff lived. He acknowledged that he did not know whether any employer with the job classifications mentioned would have actually hired a person with plaintiff's mental and physical impairments, or even whether there were any vacancies during the period in question. It was his feeling "that the competition would be stiff" for a person with the plaintiff's background. Mr. Cooper then explained that he did not intend to indicate that any of the job classifications were available, but only "that they were in existence." He stated

that before he could definitely state whether any given employer would hire a particular individual at a specific time, he would have to know them both, and know the requirements of the employer. He was not sure whether the Dictionary of Occupational Titles he was using had been revised since 1956, had made no effort to find out, and stated that it was possible some of the job classifications had later been eliminated. He conceded that the plaintiff probably would have had difficulty in obtaining employment, even if there had been a vacancy. He had not checked with any textile or other industrial plant concerning job classifications, or the existence of any vacancies in the classifications he had mentioned. And finally, in making his evaluation with respect to the physical and mental ability of the plaintiff to work, Mr. Cooper stated that he necessarily had to evaluate the statements of the plaintiff in light of the medical testimony and then make a judgment as to the weight to be given the subjective complaints of the plaintiff as compared to the reports of the various doctors. At no time did the witness state what training or experience qualified him to evaluate the medical testimony, or express an expert opinion in this area.

In considering the testimony of Mr. Cooper, it is important to keep in mind that the employment opportunities must be actually, not merely theoretically, available. Also important are the plaintiff's age, limited education and restricted work history. The citing of catalogs or dictionaries "which list or contain capsule descriptions of thousands of jobs is unpersuasive." Hanes v. Celebrezze, 4 Cir., 337 F.2d 209 (1964). It is not necessary that the plaintiff be bed-ridden to come within the provisions of the statute. Neither is it necessary that she verbally negative her capacity for, or availability to, each employment opportunity that might be suggested by a vocational expert. "Where the statute refers to 'any substantial gainful activity' the word 'any' must be read in light of what is reasonable and not of what is merely conceivable." Thomas v. Celebrezze, 4 Cir., 331 F.2d 541 (1964). Additionally, the Court finds great difficulty in understanding how the Secretary could qualify a person such as Mr. Cooper, with no medical training or experience whatever, as a medical expert, and then make a finding, based on such testimony, that the plaintiff was physically able to perform certain work during the period in question. Equally puzzling is the failure of Mr. Cooper to even check to determine whether the job classifications he cited were available in the vicinity of the plaintiff's home. Perhaps the answer is to be found in the recommended opinion of the Hearing Examiner, which was approved and adopted by the Appeals Council, where any duty on the part of the Secretary to establish the actual existence of a job opening or vacancy available to the plaintiff is disclaimed, and it is stated that "the ability to find employment must be distinguished from the capacity to work." This reasoning is fully and effectively answered by the recent decision of the Court of Appeals for this Circuit in Cyrus v. Celebrezze, 4 Cir., 341 F.2d 192 (1965), when the Court stated:

"The 'U. S. Dictionary of Occupational Titles' and other similar materials may have a proper function. But exclusive reliance on these books is not enough. Ray v. Celebrezze, 340 F.2d 556 (4th Cir. 1965). The existence of jobs in a compilation running the full gamut from astronaut to zookeeper, available somewhere in the national economy, from Anchorage, Alaska, to Zapata, Texas, is of little relevance. Since the abstract 'average' man is not the standard to be used, Pearman v. Ribicoff, 307 F.2d 573 (4th Cir. 1962), there must be evidence to show the reasonable availability of jobs which this particular claimant is capable of performing."

In summary, the subjective evidence of severe pain since the injury in 1958 is uncontradicted. There is no hint or suggestion that the plaintiff is a malingerer. She impressed the Hearing Ex-

aminer as being an honest, truthful and sincere person. During the latter part of 1959, Dr. Bergen, a neurosurgeon, felt that plaintiff suffered from a possible herniated disc. The same diagnosis was made by Dr. Ames, another neurosurgeon, on April 1, 1961. Dr. Smith, on August 21, 1961, found that plaintiff was unable to work due to her back, and on June 18, 1962, reported that her condition was permanent and also of such a nature as to render her incapable of performing any work. Again, on August 2, 1962, Dr. Smith reported that arthritis had involved all large joints of the body along the spine and was a progressive disease. On September 25, 1963, Dr. Proctor, a specialist in psychiatry, found that plaintiff was incapable of functioning at a remunerative job, but had no opinion concerning her condition from 1958 to 1961. At the same time, Dr. Martinat, an orthopedic surgeon, found a substantial limitation in motion in plaintiff's lumbar spine, and a shortness of her lower left extremity, but was unable to make a definite diagnosis due to the unavailability of x-rays. He was not prepared to express an opinion concerning the ability of plaintiff to engage in any type of gainful activity. On March 19, 1960, Dr. Boyd, another orthopedic surgeon, was of the opinion that plaintiff was suffering from a ruptured intervertebral disc, and on April 2, 1960, was of the opinion that plaintiff was suffering from a sprain of her lumbosacral spine superimposed upon a degenerative disc, even though a lumbar myelogram was negative. On September 11, 1963, Dr. Smith felt that plaintiff's condition would never improve. Dr. Davis and Dr. Register were unable to make objective findings of any injury or disease, but on November 28, 1959, Dr. Davis reported the impression of a herniated disc. No medical expert expressed the opinion that the plaintiff was capable of returning to any type of work. The Secretary was apparently impressed by the inability of either Dr. Register or Dr. Martinat to diagnose the cause of plaintiff's suffering, and was content to rest his decision upon this negative evidence to the exclusion of the overwhelming medical testimony to the effect that plaintiff was suffering from a disabling injury or disease. The testimony of Dr. Proctor was simply passed over with the statement that it did not relate to the condition of the plaintiff during the critical period. Certainly, the testimony of Mr. Cooper constitutes no basis whatever for a finding that plaintiff was under no disability as defined by the Act. Neither does it afford a basis for finding that actual business opportunities were available to her.

Actually, the only substantial question presented, in the opinion of the Court, is whether the plaintiff's condition was remediable. This same problem was referred to in the Memorandum Opinion filed on June 19, 1963, but was apparently considered by the Secretary to be of little significance. Dr. Boyd did not feel that the plaintiff's condition was operative at the time of his examination on March 28, 1960. Dr. Ames was satisfied that surgery was the only form of definitive treatment that could be offered the plaintiff, but he made no recommendation one way or another. Dr. Martinat only professed to be speaking in generalities when he stated that a herniated disc was a remediable condition. Clearly, this testimony affords no basis for a finding that plaintiff's condition was remediable, and thus not disabling under the Act. This is particularly true in view of the fact that the record fails to disclose that any medical expert stated that plaintiff's particular condition could be remedied by an operation, or that an operation was even recommended. Generalized statements afford no basis for a positive finding.

The Court is of the opinion, and finds as a fact, that the record as a whole, including the expert medical testimony and the evidence as to plaintiff's subjective pain, overwhelmingly establishes that plaintiff, since long before March 1, 1961, and continuously thereafter, has been unable to perform any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in

death or to be of long continued and indefinite duration, and that the record is barren of substantial evidence to the contrary. Neither is there any substantial evidence that plaintiff's condition is remediable. Accordingly, the defendant's motion for summary judgment should be overruled, and the plaintiff's motion for summary judgment should be granted.

An order will be entered remanding the cause to the Secretary of Health, Education, and Welfare with the direction that plaintiff be granted the period of disability and disability insurance benefits to which she would have been entitled had her initial application been approved.