Nellie W. **RIDDLE**, Plaintiff,

v.

Honorable Anthony J. **CELEBREZZE**, Secretary of Health, Education, and Welfare of the United States of America, Defendant.

Civ. A. No. 4144.

United States District Court
W. D. South Carolina,
Spartanburg Division.

Nov. 16, 1964.

James B. Stephen, Harvey W. Johnson, Spartanburg, S. C., for plaintiff.

John C. Williams, U. S. Atty., Robert O. DuPre, Asst. U. S. Atty., Greenville, S. C., for defendant.

WYCHE, District Judge.

This is an action asking the District Court to review a final decision of the Secretary of Health, Education and Welfare, in accordance with 205(g) of the Social Security Act (42 U.S.C.A. § 405(g)). The decision of the Secretary denied the plaintiff the period of disability and disability insurance benefits for which she applied.

The prescribed standard of review, found in section 205(g) of the Act, 42 U.S.C.A. § 405(g), is as follows:

" * * * The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive, * * *." Substantial evidence has been defined innumerable times as more than a scintilla, but less than preponderance. Consolidated Edison Co. of New York v. N. L. R. B., 305 U.S. 197, 59 S. Ct. 206, 83 L.Ed. 126 (1938). The Secretary, and not the courts, is charged with resolving conflicts in the evidence, and it is immaterial that the evidence before him will permit a conclusion inconsistent with his. Snyder v. Ribicoff, 307 F.2d 518, 520 (CA 4, 1962). If his findings are supported by substantial evidence, the courts are bound to accept them. Underwood v. Ribicoff, 298 F.2d 850 (CA 4, 1962). In short, the courts are not to try the case de novo. At the same time, they must not abdicate their traditional functions; they cannot escape their duty to scrutinize "the record as a whole" to determine whether the conclusions reached are rational. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Boyd v. Folsom, 257 F.2d 778 (CA 3, 1958): if the conclusions reached are rational, they must be upheld; but if, for example, reliance has been placed upon one portion of the record to the disregard of overwhelming evidence to the contrary, the courts are equally bound to decide against the Secretary. Park v. Celebrezze, 214 F.Supp. 153 (W.D. Ark.1963); Corn v. Flemming, 184 F. Supp. 490 (S.D.Fla.1960).

In such a circumstance the courts are empowered either to modify or reverse the Secretary's decision "with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g). See, Thomas v. Celebrezze, 331 F.2d 541 (CA 4, 1964.)

■ The statute, 42 U.S.C.A. § 416 (i), defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration * * *." While it casts upon the claimant the burden of proving that such a disability exists, it is not expected that this burden shall be carried to a point beyond a reasonable doubt. Ollis v. Ribicoff, 208 F.Supp. 644 (W.D.N.C. 1962). There really are two steps to a finding of disability: first, a finding of a "medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration" and second a finding that the impairment in fact causes an inability to "engage in any substantial gainful activity * * *." Butler v. Flemming, 288 F.2d 591, 593 (CA 5, 1961). But in regard to the second step, the abstract "average" man is not the criterion. The inquiry must be directed to the particular claimant; not to people in general or even claimants in general. Pearman v. Ribicoff, 307 F.2d 573 (CA 4, 1962); Thomas v. Celebrezze, supra.

■ Test of claimant's disability or inability to engage in any substantial gainful activity is a subjective one, and claimant need not establish complete absence of any opportunity for substantial gainful employment but need only establish that she has become disabled from employment in any work in which she could profitably seek employment in light of her physical and mental capacities and her education, training and experience, and she need not be totally helpless or bedridden. Jarvis v. Ribicoff, 312 F.2d 707 (CA 6, 1963).

Plaintiff was born June 20, 1914. She completed the fourth grade in school and went to work in a cotton mill as a spinner when she was twelve years old, and has worked in different textile mills since that time until 1959, when she quit work on account of her health. She married July 27, 1940, and she and her husband have no children. She lives with her husband, who is disabled, in a rented house near Chesnee, South Carolina.

The alleged date of disability is October, 1959, the last day she worked in Chesnee Mill, at which time she was about forty-four years old, and had been suffering from multiple physical and

emotional problems or diseases. The "spells" or "episodes" of which she complained, and the doctor confirmed, as arising from her most severe impairment, became increasingly frequent during the last year she worked and such an experience occurred while she was on the job the last day of work.

For the year immediately preceding her termination of employment, plaintiff experienced these "fainting spells" or "episodes" with increasing frequency, on an average of twice a week. Five of these attacks were of such severity that she visited or called a physician; other times plaintiff would lie down and rest and thereby obtain relief.

The plaintiff's activities are very restricted; her daily routine consists of television viewing, frequent bed rest, a stroll in the yard or on the porch; the meals are prepared by her and her husband and are of the variety that can be "warmed up" without much effort. Plaintiff's sister and mother do all of the heavy housework in plaintiff's home; these relatives also cook from time to time.

When plaintiff experiences one of the "spells" or "episodes" she either gets pale or real flushed in the face; she becomes weak and seeks to sit down, or preferably, to lie down. Her personal physical physician testified that these are symptoms of angina and such medical diagnosis was made by him and he prescribed nitrate-type drugs to which she responded in the expected manner. He testified that "Angina is caused by a temporary lack of blood supply to the heart muscle brought on by a restriction of the blood flow through the coronary arteries. This is usually caused by a nerve impulse which can be brought on by either a condition inside the blood vessels, or it can be brought on by strictly outside nervous influences, tension, anxiety influences * * * If the tendency to angina is there, then physical exertion will bring on the pain. * * * any type of work that a person does where the arms are the primary moving part of the body, such as a woman's everyday sweeping, mopping, ironing, hanging up clothes, working in the closets, preparing meals at the table or at the stove—most any type thing that a woman would do in her home would be an incentive for an angina episode if she tends to have them, because almost all of her household activities have to do with the working of the arms and shoulders."

The plaintiff is also suffering from paroxyemal auricular tachycardia (PAT) and has been so diagnosed by several of the doctors who examined the plaintiff. Her personal physician testified that on one occasion when she was having one of these attacks he found "her pulse rate was running around 150 to 160", and concerning the angina-PAT episodes, he testified in answer to the question "Is it possible in any way to predict when an episode of PAT will come on?", "Only in the sense of the word that the patient who tends to have PAT carries on any kind of exertional activity which has most assuredly in the past brought it on, they can pretty well look for it," and that the chances are that it would be much more frequent if one is in the regimen of exertional activity, and that from mental and emotional standpoints, the occurrence of angina would be more of a fact to be considered than the occurrence of the PAT. Plaintiff has experienced enough episodes to "show" some heart damage on electrocardiogram examination, though she may not have suffered the "classical" heart attack. In 1963, her EKG showed wave depressions "consistent with myocardial diseases and subocardial ischemia &/or digitalis effect." In a later report an internist stated that a Master Two Step Test was not performed, and was considered "contraindicated on the positive base line EKG revealing strain and ischemia consistent with myocardial disease."

Plaintiff's personal physician says "I don't believe that she would be able to carry on any kind of a regular, routine, that you and I would refer to as job—remunerative job, that would require any type of exertional activity, any type of

meeting with the public, any type of activity where she would be caught up in the regular swing of things, so to speak."

Plaintiff's personal physician could not predict whether psychiatric care would materially bring about improvement, but with regard to the heart disease being psychosomatic, he testified, "Q. When you say this psychosomatic heart disease —that doesn't—without organic basis— that still means, though, that that pulse rate's 150? A. It still means that the patient feels every symptom of her heart disease that I have expressed that she has expressed. The only difference between psychosomatic cardiac disease and real organic heart disease, in my opinion, is simply the fact that when the doctor checks her—when he does a cardiogram of her, possibly, or when various other tests are carried out—he cannot put his finger on a definite organic condition, just as Dr. Burgess said in his report, that he has no organic basis. But in my own humble opinion, that patient, whether it be this claimant or the man out here on the street, if he has that type condition, whether it be a psychosomatic angina, a psychosomatic ulcer that can actually bleed, he still has the symptoms and he still has the disease. Q. You have some objective evidence of PAT—the pulse? A. Well, you have a pulse of 160 and the patient is sweating—clammy. Then whether it be psychosomatic or organic, it's real. That's all you can say about it. Because a person's psyche is very strong, but it's not strong enough that it can make them run up a pulse rate of 150 and break out in cold, clammy sweat. There has to be a mechanical change in the body physiology in order for something like that to occur, and that mechanical change, then, is an increase in blood—in heart rate and a decrease in blood flow. Examiner: You do not think that a highly emotional state can cause this mechanical change? A. No, not simply by itself. We talked about the numbness on the left side. Emotional states can cause many physiological changes, but in order for that physiological change—for instance, when you're talking about a person getting so cold and clammy, you check the blood pressure's down 90 to 100, then there's a physiological change, yes, but that physiological change simply means that old heart rate is going so fast that the amount and volume of blood that it can pump up is not great enough."

There is in plaintiff's case "objective clinical evidence" in the form of recorded pulse rates during attacks of PAT, and EKG readings reflecting myocardial damage resulting from repeated attacks of angina over the years. In addition to plaintiff's heart condition, she has various other ailments or impairments, both physical and mental, she has a chronic anal condition for which she has had surgery several times. Plaintiff is quite nervous and has a chronic anxiety neurosis. No doctor takes exception to the fact that plaintiff is not stable emotionally. The medical reports to the insurance company during 1959, and 1960, make repeated reference to this neurosis or tension, and plaintiff's personal physician does not foresee substantial improvement in this connection.

As to the testimony of the vocational witness in this case, the Thomas case, supra, holds that the use of the Dictionary of Occupational Titles, containing descriptions of 22,000 jobs, in attempts to find jobs performable by claimant is an "unpersuasive" approach. Plaintiff does not have to negate her capacity to do these jobs. The testimony of the vocational witness was unrealistic. Apparently she led the Hearing Examiner off to a "make believe" industrial world where employers, rather than operating for a profit, provide sheltered work shop conditions for highly emotional heart patients. But these are visions of employment conjured up by an active imagination, for human experience clearly reveals that employment opportunities for this plaintiff are non-existent. The Fourth Circuit, speaking through Chief Judge Sobeloff in the Thomas case, concluded its opinion on a note of industrial and economic realism by stating, "It

is the duty of the Secretary to protect the public funds from malingerers; but where, as here, the possibilities of obtaining employment are practically nil, it is no answer that the claimant may be theoretically capable of performing some one of the 'non-physical, observational' jobs contained in an exhaustive list covering places and circumstances utterly irrelevant to her situation. Employers are concerned with substantial capacity, psychological stability, and steady attendance; they will not unduly risk increasing their health and liability insurance costs. It is unrealistic to think that they would hire anyone with the impairments of this claimant."

 After a careful examination of the record in this case and the foregoing authorities, I am of the opinion that the final decision of the Secretary is not supported by substantial evidence and is clearly erroneous. On the contrary, the conclusion that plaintiff is unable to engage in any substantial gainful activity appears self-evident to me. Plaintiff in this case is the victim of medically determinable impairments of serious and substantial proportions which can only be expected to be of long and indefinite duration. As a direct result of these impairments plaintiff has been unable since October 27, 1960, to follow her employment for which she was suited. Plaintiff's physical and mental impairments, when considered in connection with her individual circumstances of age, work experience, education, training and skill, serve to eliminate effectively, any reasonable possibility of suitable employment or employment for which plaintiff is qualified.

Under the foregoing authorities, I must conclude that the findings of the Hearing Examiner as to the establishment of a period of disability and disability insurance benefits are not supported by substantial evidence on the record considered as a whole and under the authority for appeal given by 42 U.S.C.A. § 405(g) the conclusion of the Secretary that the plaintiff was not entitled to the period of disability and the disability

insurance benefits was clearly erroneous, was incorrect, and must, therefore, be reversed.

It is, therefore, ordered, That the decision of the Secretary in this case be and the same is hereby reversed, with direction that judgment be entered for the plaintiff.