Ruby B. HAMLET, Plaintiff,

v.

Anthony J. CELEBREZZE, Secretary of Health, Education, and Welfare, Defendant.

Civ. A. No. AC–1411.

United States District Court
E. D. South Carolina,
Aiken Division.

March 1, 1965.

John T. Bodenheimer, of Henderson, Salley, Cushman & Summerall, Aiken, S. C., for plaintiff.

Wistar D. Stuckey, Asst. U. S. Atty., for Eastern Dist. of South Carolina, Columbia, S. C., for defendant.

HEMPHILL, Chief Judge.

Action brought pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to review a final decision of the Secretary of Health, Education, and Welfare. Said final decision holds that plaintiff is not entitled to a period of disability or to disability insurance benefits under Sections 216(i) and 223 of the Act, respectively, 42 U.S.C. §§ 416(i) and 423, based on her application filed on November 19, 1962. On the basis of the application, plaintiff had to establish that she was under a "disability" within the meaning of the Act beginning on or before Febru-

ary 1, 1963 for entitlement to disability insurance benefits and on or before February 19, 1963 for establishment of a period of disability.

The only question this Court can properly consider is whether or not the Secretary's decision was based on substantial evidence. There is no authority to try this matter de novo, only to review to ascertain if there is a substantial evidentiary support for the Secretary's decision. If there is such "support", the decision must stand, but if, for example, undue reliance has been placed on one portion of the record and there is a total disregard for overwhelming evidence to the contrary, the Court is compelled to reverse the Secretary. Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964); Perry v. Celebrezze, 236 F.Supp. 1, 2 (W. D.S.C.1964).

The Secretary has made his findings that plaintiff is not so disabled that she is unable to engage in substantial gainful activity. As the Court noted in Jenkins v. Celebrezze, 335 F.2d 6, 8 (4th Cir. 1964), there are four elements of proof to be considered: "(1) The objective medical facts, (2) The diagnoses, (3) Subjective elements of pain and disability testified to by claimant, and (4) Claimant's educational background, work history and age."

The record reveals that plaintiff is a white female who has never been married. She was born in 1923. At the time of the hearing her height was 5′2″ and her weight was approximately 139 pounds. At other times she had weighed as much as 164 pounds, but a medically prescribed diet had helped her to reduce. Her father died before she entered school and she attended school irregularly through the sixth grade when she dropped out of school at about age 13–14 years. She has had no other schooling or training.

During her adolescence she caused her mother to be released from the South Carolina State Hospital and cared for her even though her mother was mentally ill. On February 12, 1942, she began work in a textile mill where she worked until about May 30, 1958, as a drawing tender in the card room which consisted of lifting and emptying cans containing strands of cotton. At the latter time, the company was changing equipment and the plaintiff and others were being transferred to other work. She was unable to do the new work (which is unspecified in the record) because of visual problems and other physical deficiencies and was placed on a leave of absence. Plaintiff has wage earnings posted through the third quarter of 1958. In the same year she was operated upon and attempted to return to work with Graniteville Company, but was not reemployed because of defective vision. Following this, the plaintiff had surgery for two corneal transplants on the right eye, the first not being considered a success. In about July 1961, the plaintiff was employed to help care for an elderly man and his blind wife in their home. The hours were from 8:00 A.M. to 1:00 P.M. on Monday through Friday for a salary of $12.00 per week. The job consisted of cooking the noon meal, straightening up the three room house with the help of the elderly man, doing some washing in a machine with the help of the man, and doing the necessary ironing. This work lasted about five months and the plaintiff finally quit about the last of November 1961 because she kept getting sick and her doctor advised her to stop work.

In the early part of January 1962 she took a job helping with a lady who was an invalid and this work lasted until about the middle of September 1962. The hours of work were from 8:00 A.M. until 4:00 P.M. on Monday through Saturday. The job consisted of helping with the invalid, including cooking the noon meal. The husband of the invalid helped her with everything and there was another woman who did all the general housecleaning. During the period of the employment, the plaintiff was absent some because of her health. The frequency of the absences is not clear, but the inference from the record is that it was frequent. The plaintiff was sick

during the whole time that she worked and her condition became progressively worse in that she had infection of the kidney, elevation of blood pressure, nervousness, irritation of the stomach, hurting of the back and increase in cholesterol. As a result, she was confined to her bed. This was the last employment that the plaintiff had and it ended about the middle of September 1962. In November of 1962 she was advised by the South Carolina Vocational Rehabilitation Department that they could not help her.

The plaintiff does not and has never operated a motor vehicle and is dependent upon public transportation and transportation furnished by friends and relatives, when available. She lives alone in a small single-story, three-room house, which is in the aggregate 20 feet by 22 feet. Plaintiff warms herself with an oil heater, cooks on an electric stove and has only cold water which is piped in from a nearby house. The land on which the house is located is described as "a little tiny piece of ground" and the yard is "just growing up" because the plaintiff is unable to do any yard work and she does not keep a garden.

In her home, the plaintiff does only a minimal amount of household work and does that only when she feels up to it. She is helped by friends and relatives who are interested in her. Most of the time she is able to tend to her personal needs, but not always. Her brother lives less than a block away and she gets groceries from a store which is even nearer by going herself or getting someone to make purchases for her. She is a member of the Church of God and attends when she is able and a bus from the church provides transportation. Since she was last employed, the plaintiff has received welfare benefits from the State of South Carolina because of disability.

The plaintiff alleged in her application for benefits that her impairments were corneal transplant in the right eye, disease of the left eye, arthritis of the spine, high cholesterol, thyroid trouble, collapsing of veins, chronic kidney infection, tumor of the stomach and female trouble. The application is couched in the language of the lay person, but the evidence reveals that these allegations are substantially correct. The record in this case reveals that the plaintiff has been in poor health, more or less, for most of her life. Commencing in 1955, the record of her health is well documented by the reports of physicians and various hospitals. Between 1955 and through 1962, the plaintiff has been hospitalized on ten or more occasions, only two of which were caused or instigated by her own will. These two occasions were the admission to Providence Hospital for the corneal transplants in her right eye.

The Hearing Examiner resolved the evidence against the plaintiff primarily on the basis of the report of Dr. William A. Fuller who had examined her on one occasion at the behest of the Government. This treatment of the evidence does not sustain a rational conclusion.

Dr. Fuller, a practitioner who confines his practice to internal medicine, but who is not certified as a specialist in that specialty, examined the plaintiff on February 7, 1963, and rendered a report which shows physical findings as to blood pressure and pulse rate, but does not indicate that any readings were made after exercise or exertion. Dr. Fuller did note a finding of tenderness in the right flank and over the right kidney area posterior. The report does not show that any x-rays were made of the kidneys or that tests to determine the degree of function of the kidneys were made. The findings did include a finding of varicosities in the left leg from the thigh to the ankle. His diagnosis was: Anxiety tension state, moderately severe; menopausal syndrome; superficial varicosities of left lower extremity; and possible porphyrinuria. [Porphyrinuria applies to the excessive urinary excretion of porphyrin and may constitute only one of the clinical features of porphyria. Clinical Disturbances of Renal Function, Abraham G. White, M. D., F.A.C.P.

(1961)]. Dr. Fuller also reported: "The Multitude of complaints that this patient had at her age and her history of various illnesses occurring at the age of 14 combined with the lack of any definite serious pathological, or physical findings *at this examination* leads me to believe that most of this claimant's trouble lies within her severe anxiety tension state." (Emphasis added.)

In reference to plaintiff's kidney condition, Dr. Daniel C. Williams, a certified urologist, treated the plaintiff since 1955 and stated that plaintiff had chronic pyeloneophritis—recurrent, and that this condition was indicated by x-ray. On November 12, 1962, Dr. Barfield reported a present condition of pyelonephritis and it should be noted that Dr. William E. Barfield and Dr. Williams have had the plaintiff under their care for a great number of years. Dr. Theodore W. Mappus, Jr. reported on November 19, 1962, a diagnosis of kidney infection. Dr. F. A. Kennedy reported on January 21, 1959, a diagnosis of chronic pyelonephritis. Dr. Mappus reported a diagnosis of pyelonephritis and that he had treated the plaintiff from July 27, 1961 through January 11, 1963 on many occasions. Dr. Mappus again confirmed this diagnosis on February 16, 1963 and reaffirmed the diagnosis on May 10, 1963 and August 13, 1963. It is significant that on August 13, 1963, Dr. John Matthews stated that the plaintiff continued to show pus in the urine, which is some six months after Dr. Fuller had not found pus in the urine on February 7, 1963. Dr. Fuller also failed to have x-rays made of the kidneys even after he had found tenderness over the right flank and over the right kidney. Certainly an x-ray was indicated in view of these findings and the plaintiff's long history of kidney trouble made known to Dr. Fuller. Under these circumstances it is not rational to find that the plaintiff did not and does not have chronic pyelonephritis of the right kidney.

Dr. Barfield, a certified gynecologist, has treated the plaintiff monthly for over five years and he has not mentioned in any of his reports a diagnosis of menopausal syndrome, but has given a diagnosis of metrorrhagia and fibromyoma. Dr. Matthews in one report of September 27, 1962, indicated that plaintiff was having some female trouble with ovarin, but that diagnosis or that finding does not appear in any of his subsequent reports. It is not rational or reasonable for the hearing examiner to attribute the plaintiff's gynecological problems to the menopausal syndrome on the basis of a report which Dr. Fuller made as a result of one examination and ignore the findings of a certified gynecologist who has treated the patient monthly for seven years or more and the report of her general physician who has treated her frequently for an extensive period of time.

The plaintiff is not blind and does not claim statutory blindness, but her vision is impaired and her eyes cannot be corrected to provide normal vision. Dr. C. H. Peebles, Jr., a certified ophthalmologist, who has examined the plaintiff on thirty-three occasions, stated that the uncorrected vision in both eyes was 20/300, and the left eye was corrected to 20/25 and the right eye to 20/50 at far distance. It is incredible that Dr. Fuller could make an accurate finding that the plaintiff's vision was 20/30 uncorrected, which he undertook to do. Any conflict on this point must be resolved on the basis of Dr. Peebles' report. In addition, there is no evidence in the record of the visual acuity of plaintiff's near vision. The plaintiff's complaint of pain and discomfort in both eyes is amply supported by her own sworn testimony and the reports of Dr. Peebles and other physicians. Dr. Matthews has reported that there is keratoconus in both eyes and Dr. Peebles' report acknowledges a bilateral correction of keratoconus. It is not rational to restrict a consideration of the plaintiff's visual impairment solely to the vague finding of visual acuity by Dr. Fuller. It is only rational to consider this impairment in light of the diminished visual acuity in the pain and

discomfort which the plaintiff experiences in the use of her remaining vision.

Dr. Matthews and Dr. Mappus reported arthritis and the hearing examiner has found that the plaintiff has osteoarthritis of the spine. Although the plaintiff does not have the mechanical movement of her spine limited by the arthritic condition, the record is replete with her statements as to the pain and discomfort which she experiences in connection with her spine.

The hearing examiner found that the plaintiff had porphyrinuria which was a diagnosis by Dr. Fuller. This in itself is a recognition that the absence of porphrins when the plaintiff was examined by Dr. Fuller was not conclusive on the issue of whether the plaintiff had this condition. As stated in Clinical Disturbances of Renal Function, supra, at page 376:

> "The porphyrias belonged to a series of genetically—induced metabolic errors in the synthesis of porphyrins for pyrroles. Porphyrinuria applies to the excessive urinary excretion of porphyrin and may constitute only one of the clinical features of porphyria."

In reports by Dr. Matthews subsequent to the examination of the plaintiff by Dr. Fuller, Dr. Matthews has again made this diagnosis and has stated that it is a serious and chronic intermittent disease.

■ There is no question that plaintiff has varicosities in the left leg and it is common knowledge that they cause pain upon standing for long periods of time.

The hearing examiner has found that the plaintiff is a passive-dependent personality manifested by an anxiety tension state.

When the various impairments of the plaintiff are considered in the aggregate, rather than as fragments, the hearing examiner's decision that the plaintiff is able to engage in substantial gainful activity is not rational. A review of the plaintiff's activities and the circumstances under which she lives conclusively shows that she engages in only minimal activities that are necessary to sustain herself. Her activities are dictated by her physical condition and are accomplished in her own discretion and on the schedule that she selects. It appears extremely doubtful that even these minimal activities could not be accomplished if they were required to be done on a fixed schedule and at a set rate.

■ Since leaving the mill, the plaintiff has had two jobs, neither of which lasted for any length of time because of her physical impairment. The first employment as a practical nurse, and the words "practical nurse" are used advisedly, she had a salary of twelve ($12.00) Dollars per week. On the second job as a practical nurse, she had an income of twenty-five ($25.00) Dollars per week. Even if the plaintiff could return to this type of employment, it cannot be rationally said that it would be substantial gainful activity. See Hanes v. Celebrezze, 337 F.2d 209, 214 (4th Cir. 1964).

The plaintiff's pastor testified in substance that: he had been the pastor of her church since September 1960 and she was a member. The following is a portion of his testimony:

"Q. Did you have a statement that you wished to make on her behalf?

"A. Well, she has been sick off and on ever since I assumed the pastorate. When I first came there she was having tremendous trouble with her first transplant. In fact, she was in bed more than she was up. And then, see, I came in September and I believe the second transplant was in October or November and other than the few times she has worked as a housekeeper or helping the sick she has been down just about all the time.

"Q. Have you had occasion to visit her in her home?

"A. Yes, sir, many times.

"Q. How have you found her during those visits? Has she been up moving about?

"A. Most of the time she has been either in bed or just lounging around in the home.

"Q. Have you visited her frequently or infrequently?

"A. Well, at times frequently and at other times infrequently. During her time of illness I visited her every day, possibly for several days, and then when she would become better maybe once a week and then for several weeks I wouldn't visit at all.

"Q. Most of your visits were made right before and after the last transplant?

"A. Well, no, sir. My visits have been practically ever since I've been here because she has been sick off and on ever since I've been in Langley."

A friend of the plaintiff testified, in substance, that she had known the plaintiff since she was a child, that she had seen the plaintiff every week or two for the last several years, that the plaintiff's testimony was true, that she had known the plaintiff through her years of bad health and that recently the plaintiff had made a decline in her physical ability to work.

The hearing examiner called a vocational expert who testified that in her opinion the plaintiff was capable of performing the following lines of gainful employment during the period covered by the application: Candy packer in the confection business, checker in a laundry or dry cleaning business, sewer or mender in a hotel, restaurant, laundry or mortician's business, shirt folder in a laundry or garment business, steam table attendant in a cafeteria, practical nurse, sales clerk, gift or package wrapper in a retail store, wrapper or tray-loader in a bakery, tabcutting machine operator in the knitting goods industry, mother's helper in a kindergarten or nursery, pattern duplicator in the textile industry, sorter in the clerical field, stocking inspector, cashier in a small eating establishment or small dime store or business, or operator of a PBX.

The vocational expert, who had observed all the proceedings before testifying as the last witness, and who had reviewed all the documentary medical evidence stated: "It is my *opinion based on the medical evidence of record and the interpretation of the law that there* were jobs available in this immediate community where she could function with some degree of regularity." [Emphasis supplied.]

A review of the testimony of this vocational expert indicates that she has some education in addition to an A. B. degree in psychology and has experience in the field of rehabilitation, but there is no evidence which shows that she is a qualified physician or that she was capable of comprehending the *conflicting* medical evidence and information upon which she based her opinion. The medical evidence and reports are couched in the technical and professional language of physicians and without a showing that she fully comprehended this evidence and these reports, her testimony has no greater weight than the testimony of any other non-physician. Of course, the Secretary or his appointed representative has the task of determining how much weight will be allowed the testimony in question. See DAVIS, ADMINISTRATIVE LAW TREATISE, § 14.13, and Keller v. F. T. C., 132 F.2d 59, 61 (7th Cir. 1942). But this Court has a duty as well and cannot and will not abdicate its role as a reviewing authority. With this in mind, if it is apparent that undue weight has been placed upon the conclusions of an expert witness, which conclusions are based on facts not properly considered or understood, then this Court must take this witness' testimony and place it in prospective when viewing the "record as a whole" to determine if the Secretary's decision is based on substantial evidence. Viewing the "record

as a whole," there can only be a finding that the Secretary's decision is not supported by substantial evidence within the purview of the Act.

Keeping in mind the diagnoses reflected in the several medical reports, i. e., poor eyesight, difficulty standing for long periods, inter alia, and taking into account plaintiff's education, age, etc., the vocational witness stated that plaintiff could be a "sewer or mender in a hotel, restaurant, laundry or mortician's business," or a steam table attendant in a cafeteria. * * * Not even taking into account that the vocational witness based her opinion "on the medical evidence of record and the interpretation of the law." [1] it is simply not reasonable to say that a person who has difficulty standing for long periods is going to be given a job working at a cafeteria steam table nor is a person with faulty corrected vision going to be given a job doing sewing. Like reasoning applies to the vocational witness saying that plaintiff could be trained as an operator of a PBX (switchboard). Are they going to start printing telephone directories in large type for this hapless claimant?

This "ivory tower" view of some vocational experts, see Frazier v. Celebrezze, 236 F.Supp. 938, 942 (E.D.S.C.1965), was placed in its proper perspective in an able opinion by Judge Wyche in Riddle v. Celebrezze, 235 F.Supp. 657 (W.D.S.C.1964), where he noted:

"As to the testimony of the vocational witness in this case, the Thomas case, supra, holds that the use of the Dictionary of Occupational Titles containing descriptions of 22,000 jobs, in attempts to find jobs performable by claimant is an 'unpersuasive' approach. Plaintiff does not have to negate her capacity to do these jobs. The testimony of the vocational witness was unrealistic. Apparently she led the Hearing Examiner off to a 'make believe' industrial world where employers, rather than operating for a profit, provide sheltered work shop conditions for highly emotional heart patients. But these are visions of employment conjured up by an active imagination, for human experience clearly reveals that employment opportunities for this plaintiff are nonexistent. The Fourth Circuit, speaking through Chief Judge Sobeloff in the Thomas case, concluded its opinion on a note of industrial and economic realism by stating, 'It is the duty of the Secretary to protect the public funds from malingerers; but where, as here, the possibilities of obtaining employment are practically nil, it is no answer that the claimant may be theoretically capable of performing some one of the "non-physical, observational" jobs contained in an exhaustive list covering places and circumstances utterly irrelevant to her situation. Employers are concerned with substantial capacity, psychological stability, and steady attendance; they will not unduly risk increasing their health and liability insurance costs. It is unrealistic to think that they would hire anyone with the impairments of this claimant'." 235 F.Supp. at 661, 662.

The instant matter evinces that undue reliance has been placed on one portion of the record to the disregard of overwhelming evidence to the contrary. There is no insinuation here that the Hearing Examiner was partisan or showed bias, Cf. Tele-Trip Co., Inc. v. N.L.R.B., 340 F.2d 575 (4th Cir. 1964), but it seems that if the plaintiff would have had the opportunity to enjoy the effective advocacy she enjoys in the proceeding before this Court, that the weakness of the Hearing Examiners' conclusion would have been anticipated and further examination or cross-examination of the

1. Even though distinguished authority states that the "opinion rule" does not apply to the administrative process, DAVIS ADMINISTRATIVE LAW TREATISE, § 14.13, nevertheless, the experience of courts over the centuries should not be tossed out the window completely.

vocational expert would reveal the weakness of that witness' testimony.

This Court is not going to undertake a "campaign" to remove the prohibition against a fee greater than $10.00 for counsel in a proceeding before a hearing examiner. But it seems that if effective advocacy were allowed to be brought to bear, then it would not be as difficult for a Court to search the "record as a whole." See the excellent discussion of this very real problem by Davis, supra, in the pocket part supplementing § 14.14; also, Farley v. Celebrezze, 315 F.2d 704, 706 (3rd Cir. 1963); and Perry v. Celebrezze, 236 F.Supp. 1, 2, n. 1 (W.D.S.C. 1964).

Viewing the record as a whole, it is apparent that undue reliance has been placed on one portion thereof to the disregard of overwhelming evidence to the contrary. The Secretary's decision is not based on "substantial evidence" within the meaning of the Act. Accordingly, judgment should be entered for plaintiff.

It is therefore ordered that the decision of the Secretary be reversed because not based on substantial evidence, with entry of judgment for plaintiff.

And it is so ordered.