**Inez L. COLLIER, Plaintiff,**

v.

**Anthony J. CELEBREZZE, Secretary of Health, Education and Welfare, Defendant.**

**No. 3962.**

United States District Court
D. Idaho, S. D.

April 15, 1965.

Ronald G. Carter, Millar & Callister, Boise, Idaho, for plaintiff.

Sylvan A. Jeppesen, U. S. Atty., Boise, Idaho, by Robert E. Baker, Asst. U. S. Atty., for defendant.

McNICHOLS, District Judge.

This matter is before the court for judicial review of a final decision of the Secretary of Health, Education and Welfare as provided under § 205(g) of the Social Security Act (42 U.S.C.A. § 405 [g]), hereinafter referred to as the Act. The Secretary denied the claim of the plaintiff for disability insurance benefits. Plaintiff's eligibility as to the earnings requirements is conceded.

The scope of review here is prescribed in § 205(g) of the Act in the following language:

"* * * The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive * * *."

The Secretary, and not the court, is charged with resolving conflicts in the evidence, and it is immaterial that the evidence will permit a conclusion contrary to that of the Secretary. McMullen v. Celebrezze (9th Cir., 1964), 335 F. 2d 811; Snyder v. Ribicoff (4th Cir., 1962), 307 F.2d 518, 520; Thomas v. Celebrezze (4th Cir., 1964), 331 F.2d 541; Celebrezze v. Warren (10th Cir., 1964), 339 F.2d 833, 837. However, this does not mean that the court should abdicate its conventional functions. While the court is not to try the case de novo, the record as a whole must be carefully scrutinized to determine whether the conclusions reached in the administrative procedure are rationally supported by substantial evidence. Riddle v. Celebrezze (D.S.C., 1964), 235 F.Supp. 657, 659; Freeman v. Celebrezze (D.N.C., 1964), 236 F.Supp. 785, 788; Randall v. Flemming (D.Mich., 1961), 192 F.Supp. 111, 115; McMullen v. Celebrezze, supra.

The phrase, substantial evidence, as here used, has consistently been held to mean more than a scintilla, but less than a preponderance. It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion. Consolidated Edison v. NLRB, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126.

█ The burden of proving a condition of disability within the terms of the Act is upon the plaintiff. The term disability is defined in the Act in § 223(c) (2) (42 U.S.C.A. § 423[c][2]):

"The term 'disability' means inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration. * * * *"

" * * * the courts have generally agreed that the test of a claimant's disability or inability to engage in any substantial gainful activity is a subjective one, that is, what is reasonably possible in the light of the plaintiff's physical and mental capacities and his education, training, and experience. It is not necessary that the plaintiff establish the complete absence of any opportunity for substantial gainful employment; he need only establish that he has become disabled from employment in any work or vocation in which he could profitably seek employment in the light of his physical and mental capacities and his education, training, and experience. Furthermore, it is clear that a plaintiff need not be totally helpless or bedridden in order to be considered disabled under the Social Security Act." (Citing many cases). Randall v. Flemming (D.Mich., 1961), 192 F.Supp. 111, 123.

█ With the foregoing principles in mind, the court has reviewed the record that was before the Secretary (actually before the Appeals Council) and has concluded that the plaintiff has met the burden of proof required of her, that there is no substantial evidence in support of the decision appealed from and that a reversal must be ordered.

The record shows that the plaintiff, fifty-eight years of age at the date of her hearing, has completed the sophomore year of high school and first began active employment at the age of forty-one (1946). Originally she worked off and on in a bakery and at retail bakery counters until she commenced employment as a saleslady in a department store drapery department in 1947. She followed this employment generally until 1951 when she worked for some months in a retail paint and wallpaper department of a Sears & Roebuck store. She was forced to quit as she "couldn't any longer stand this type of work." The petitioner and her estranged husband were reconciled and he supported her for the next several years during a portion of which time she was ill from rheumatoid arthritis. In 1955, or thereabouts, she again worked in a paint and wallpaper store as a saleslady, which employment continued steadily for about two and a half years at which time she was laid off because of business recession. For some nine months she drew unemployment compensation and then returned to work in the drapery section of the department store in which she had previously been employed. In the fall of 1960 the petitioner could not cope with her work and resigned. Her condition and reason for leaving this, her final employment, is best reflected in her statement made before the Appeals Examiner:

"A. Yes. Then we sold our home, moved into the trailer. We thought that we would cut down living expenses. We went to California, and I felt better in the spring when we came back,—I looked for work again. I went to the Employment Office. This was another sale at Faulk's; of course I was pretty well known there and I was able to get on during the sale. At that time there was a change in the drapery personnel. The lady was leaving who had run this department. I did not want it. I did not want that much responsibility. It is very hard for me. I break easy

under tension. I told them that the work was hard, and I asked them for any other kind of work; however, they needed someone in there. Nobody else wanted the job, so I was—, agreed to try. I had this job for a year and a half. Three months previous to the time that I quit this job I had this angina pectoris one day at work. My superiors insisted that I go to a doctor. I went to my doctor who I had since about 1953.

"Q. Who was the doctor?

"A. This was Doctor Bell. He told me the pain which I had had was angina pectoris. He told me not to work any more that day. I went home, stayed about three days and the weather was extremely hot, and I felt that possibly if I went back to air conditioned I would be much better off than I would be at home suffering from the heat; however, I had a dull pain in my chest, and—, and at that time the doctor sent me for an electrocardiogram. As I continued to work, I could never lose this pain in the chest. I talked to my doctor about it. He said that if you are still having pain you should decrease your activity. There is no way to decrease activity in the store. I was the one person working in this department. I had the responsibility to get the work out. During all this time I had suffered from digestive disturbance from nervousness, extreme tiredness. I was under constant medication. I received shots, hormone shots monthly, which supply energy. They help to control nervousness and emotional upsets. You cannot forever supply energy from shots. There comes a time when you have reached the limit. During the last few weeks I knew that I was no longer a sales person. I did not have the drive that it takes to be a sales person. I stayed with them through the fall sale. He says that this period had been compared to the time of my heart attack—, and I told them to give me plenty of help during the sale and I would see it through. I gave them notice that I would quit on October 25th. They gave me plenty of help and I got through it.

"Q. That was in 1960?

"A. 1960—, the fall of 1960.

"Q. What have you done since then?

"A. I have not worked since then.

"Q. Why not?

"A. Haven't felt like it. I don't—." (Evidence Transcript pp. 22 and 23; Case Transcript pp. 46 and 47).

As indicated, the petitioner ceased gainful employment on October 25, 1960. She made initial application for disability benefits under the Act on October 26, 1962. A series of administrative determinations led to an ultimate hearing, on January 21, 1964, before a Hearing Examiner. The adverse decision of the Hearing Examiner was, on review, affirmed by the Appeals Council and plaintiff brought this action.

The oral evidence before the Examiner consisted of that of the petitioner and her husband. This evidence was presented in a somewhat disjointed form, as petitioner was not represented by an attorney. The written reports of three doctors were also admitted as well as a statement of a neighbor given under the statutory penalty for false statements in such case. The plaintiff testified in substance that she suffered from a bad back, angina pectoris, ulcers, arthritis, nervousness, abdominal pains and an allergy. She regularly had periods of several days in which she could not get out of bed. At other times she could be on her feet for a few hours, but would have to lie down and rest periodically. She had fainted on one occasion in October prior to the hearing. She stated that she could not do the work of a saleslady and contended she was disabled from doing any work. Her husband's short testi-

mony confirmed the wife's statements. The written statement of the neighbor dated the day before the hearing stated that the plaintiff had, because of illness, been unable to do any work for the past year, had been unable to do her own housework, and had been bedfast a part of the time.

We come now to a consideration of the medical evidence. The opinions of three qualified medical doctors were admitted.

Dr. Max F. Bell made his report as of July 19, 1963. He had cared for the plaintiff as her personal physician for ten years. He diagnosed the plaintiff's medical problem as: (1) Angina pectoris, (2) Spondylolisthesis, first degree, (3) Diverticulosis of the descending and transverse colon, (4) Duodenitis, recurrent, and (5) Menopausal syndrome. His ultimate opinion states: "In view of the multiple physical impairments and their accompanying symptoms, it is my opinion that this patient cannot be gainfully employed."

Dr. Charles S. Powell, at the request and expense of the Social Security Administration, made an examination of the plaintiff in January of 1963 and made his written report on February 6, 1963, which report was admitted in evidence. Dr. Powell appears to have generally confined his examination to the plaintiff's back, though he made a diagnosis, based on history, of angina pectoris and diverticulitis. He found the following from x-ray examination of the back: "(1) Marked kyphosis thoracic vertebra. Old chip fracture of the 12th thoracic vertebra. (2) Lumbarization of the 1st sacral segment resulting in six lumbar vertebra with impingement of the posterior process on the sacrum. (3) Spinabifida lower half of the sacral segments and marked posterior angulation of the sacrum from the lumbar vertebra." From these findings, Dr. Powell summarized his opinion in the following words:

"Mrs. Collier has an unusually marked congenital defect of her lumbar spine with accompanying marked kyphosis and lordosis and severe angulation of lumbosacral angle. With these abnormalities she has a very unstable and painful back. The x-ray findings and history of angina pectoris and diverticulitis, in my opinion, totally disables her for any type of work."

Dr. Howard E. Allen, also employed by the Social Security Administration to examine the plaintiff, made his examination and report as of July 29, 1964. Dr. Allen was unable to objectively substantiate the diagnosis of angina pectoris, diverticulitis or the allergy complaint. He confirmed the back condition found by Dr. Powell and accepted Dr. Powells report as to the degree of disability to be assessed to the back impairment Dr. Allen further stated:

"The orthopedic defects do not seem of a nature likely to be remediable by medical measures."

Otherwise he expressed no opinion as to the ability of the plaintiff to follow gainful employment.

In his decision, which was affirmed by the Appeals Council and thus became the decision of the Secretary, no mention is made of the ultimate conclusions and opinions of the doctors as set forth above. The Examiner carefully extracted all medical findings of the doctors which tended to militate against the disability of the plaintiff and ignored the others. More importantly, he drew the medical conclusions for himself on a basis of the out-of-context extractions he made. Two of the three doctors specifically found the plaintiff to be unable to follow gainful employment. The other doctor doubted some complaints, but accepted the disability rating made by Dr. Powell as far as the back condition was concerned. In the case of this the Examiner made the following finding on the medical evidence:

"From a careful study of all of the medical evidence, the Hearing Examiner must conclude that this claimant does not have any medically determinable physical condition expected to be of indefinite duration, except a spinal condition which is

congenital. All of the other conditions appear to be of a temporary controllable and remediable nature. None of the conditions indicated have resulted in impairments of the claimant's bodily functions and capacities of such a severity as to be preventative of her engaging in any substantial gainful activity for which she is qualified by reason of her training, education and experience."

This finding is not based on substantial evidence and, indeed, all of the medical evidence is solidly to the contrary. The plaintiff proved that she was disabled as disability is defined in the Act and the Secretary should have so found.

It is therefore Ordered, and this does Order, that the decision of the Secretary in this case is reversed and the case remanded to the Secretary with directions that the plaintiff be granted such disability insurance benefits as she would have been entitled to had her initial application been approved.