Huston L. HUNEYCUTT, Plaintiff,

v.

John W. GARDNER, Secretary of Health, Education, and Welfare of the United States of America, Defendant.

No. C–137–S–67.

United States District Court
M. D. North Carolina,
Salisbury Division.

April 8, 1968.

Gerald R. Chandler, Albemarle, N. C., for plaintiff.

William H. Murdock, U. S. Atty., and H. Marshall Simpson, Asst. U. S. Atty., Greensboro, N. C., for defendant.

## MEMORANDUM OPINION

EDWIN M. STANLEY, Chief Judge.

The plaintiff seeks judicial review, pursuant to § 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405 (g), of the final decision of the Secretary of Health, Education, and Welfare, denying him the establishment of a period of disability and disability insurance benefits.

The plaintiff first filed an application to establish a period of disability and for disability insurance benefits on December 9, 1959, alleging that he became unable to work on March 26, 1959, because of heart trouble. This application was denied by letter dated March 29, 1960, and such denial was affirmed upon reconsideration by letter dated October 18, 1960. Plaintiff thereafter requested a hearing before a hearing examiner, which hearing was held on January 4, 1961. The hearing examiner rendered his decision on May 26, 1961, affirming the denial of plaintiff's application. Since no appeal was taken by the plaintiff, the examiner's decision of May 26, 1961, became the final action of the Secretary with respect to the application filed by the plaintiff on December 9, 1959.

On February 10, 1964, the plaintiff filed a second application to establish a period of disability and for disability insurance benefits, alleging that he became unable to work on March 26, 1959, because of heart trouble, high blood pressure and nervous condition. This application was denied initially by letter dated July 10, 1964, and the plaintiff took no further action with respect to same. Consequently, the determination of the Social Security Administration of July 10, 1964, became the final administrative action taken on the second application.

Plaintiff filed a third application to establish a period of disability and for disability insurance benefits under the provisions of §§ 216(i) and 223 of the Social Security Act, as amended, 42 U.S.C. § 416(i) and § 423, on September 16, 1965, again alleging that he became unable to work on March 26, 1959, because of heart trouble. When this application was disallowed, plaintiff requested a hearing before a hearing examiner. The requested hearing was held on September 27, 1966, before Hearing Examiner John B. Drury. On December 8, 1966, Examiner Drury rendered his decision, holding that plaintiff, based upon his application of September 16, 1965, was not entitled to a period of disability or disability insurance benefits under §§ 216(i) and 223, respectively, of the Social Security Act, "in effect prior to the Social Security Amendments of 1965, or as amended thereby." When the Appeals Council denied plaintiff's request for review, the decision of Examiner Drury became the final decision of the Secretary. On July 5, 1967, this action was instituted, seeking judicial review of the Secretary's final decision. Following the filing of an answer and a certified transcript of the administrative proceedings, the parties cross-moved for summary judgment. Both motions were accompanied by extensive briefs, and the

matter is now before the Court for decision.

■ It is not disputed that the plaintiff met the special earnings requirements of the Social Security Act from a time prior to March 26, 1959, when he allegedly became disabled, through June 30, 1964. Consequently, Examiner Drury correctly held that, in order to be entitled to a period of disability or to disability insurance benefits, it was necessary for the plaintiff to establish that he was under a "disability," as defined by the Act, on or before June 30, 1964.

Effective July 30, 1965, §§ 216(i) and 223(c) (2) of the Social Security Act, 42 U.S.C. §§ 416(i) and 423(c) (2), were amended so as to liberalize the definition of the term "disability." Before the amendment, the term "disability" was defined to mean "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration." After the amendment, the term was defined to mean "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." However, since the Court is of the view that the record as a whole establishes that plaintiff has been under a "disability" as the term was defined before the 1965 Amendment, continuously since March 26, 1959, the 1965 Amendment is not pertinent.

The specific issues before the Examiner were whether the plaintiff carried his burden of establishing that he was under a "disability," as defined by the Social Security Act, on or before June 30, 1964, when he last met the special earnings requirements, and, if so, when such disability commenced and the duration thereof.

■ The issue before this Court is the substantiality of the evidence to support the Secretary's findings on the issues before him. In Thomas v. Celebrezze, 4 Cir., 331 F.2d 541 (1964), the prescribed standard of judicial review is stated as follows:

"The prescribed standard of review, found in section 205(g) of the Act, 42 U.S.C.A. § 405(g), is as follows: ' * * * The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive, * * *.' Substantial evidence has been defined innumerable times as more than a scintilla, but less than preponderance. Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938). The Secretary, and not the courts, is charged with resolving conflicts in the evidence, and it is immaterial that the evidence before him will permit a conclusion inconsistent with his. Snyder v. Ribicoff, 307 F.2d 518, 520 (4th Cir., 1962). If his findings are supported by substantial evidence, the courts are bound to accept them. Underwood v. Ribicoff, 298 F.2d 850 (4th Cir. 1962). In short, the courts are not to try the case de novo. At the same time, they must not abdicate their traditional functions; they cannot escape their duty to scrutinize 'the record as a whole' to determine whether the conclusions reached are rational. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Boyd v. Folsom, 257 F.2d 778 (3d Cir. 1958); 4 Davis, Administrative Law (1958) § 29.02, pp. 118–126. If they are, they must be upheld; but if, for example, reliance has been placed upon one portion of the record to the disregard of overwhelming evidence to the contrary, the courts are equally bound to decide against the Secretary. Park v. Celebrezze, 214 F.Supp. 153 (W.D.Ark.1963); Corn v. Flemming, 184 F.Supp. 490 (S.D.Fla.1960). In such a circumstance the courts are empowered either to modify or reverse the Secretary's decision 'with or without remanding the cause for a rehearing.' 42 U.S.C.A. § 405(g)."

The evidence before Examiner Drury consisted of the testimony of the plaintiff and his wife, and several medical reports. Plaintiff was represented at the hearing by Gerald R. Chandler, Esquire, his present counsel.

Plaintiff testified that he was born on December 26, 1913, in Stanly County, North Carolina, had a fifth grade education, and between 1927 and 1959 worked exclusively in textile mills; that he lived with his wife, Sadie F. Huneycutt, and four minor children, ranging in age from twelve to eighteen years, in a home rented for $25.00 per month; that he was five feet and nine inches tall, and weighed one hundred and eighty-eight pounds, which was his usual weight; that he stopped school at the age of fourteen to go to work in a textile mill; that his work in textile mills had consisted almost entirely of that of a doffer, although he had, on infrequent occasions, done other work, such as boarding hose; that all the jobs he did in textile mills, whether sweeping, doffing, or boarding, required a considerable amount of physical exertion; that in 1958, at age forty-four, he suffered a heart attack and was out of work for fourteen weeks; that when he returned to work, he was placed on a lighter job as a spare hand for three weeks; that at the insistence of his employer, he returned to his regular job as a doffer, and continued in this work until March 26, 1959, when he had a second heart attack while at work; that he went to see Dr. McLeod the next morning, who advised hospitalization; that instead of going to the hospital, he returned to his home to rest; that on the following Sunday, he suffered a third heart attack; that on this occasion Dr. McLeod sent him to the hospital, where he remained several days; that when he was discharged from the hospital, he was advised by Dr. McLeod to rest and "take it easy"; that he thereafter saw Dr. McLeod weekly until, following some improvement, he began to see him every month or so, or whenever he commenced "hurting pretty bad"; that he had a scar in the center of his chest which Dr. McLeod advised him was caused by the rupturing of a blood vessel at the time of his heart attack; that he took two "heart tablets" each day, as prescribed by Dr. McLeod, for his heart trouble, and also medicine for his nerves; that he had experienced a nervous condition since his first heart attack, and that when he worried, his heart fluttered and beat rapidly; that when he exerted himself he became weak, nervous, and his heart fluttered; that he worried about his physical condition, which was one of the causes of his nervousness; that he had not tried to engage in any public work since his second heart attack on March 26, 1959; that it is possible he could have continued as a spare hand at the mill after recovering from his heart attacks, since it would have been less demanding than the doffing; that the most he had been able to do since the onset of his illness was a little work in the garden, but this usually caused him to become nervous and required rest; that if he engaged in anything that caused exertion, he got weak and nervous and his heart started fluttering; that he was only able to walk about two blocks before becoming exhausted; that in addition to shortness of breath when he walked, his legs just "gave out"; that Dr. McLeod had been his family physician more than twenty-five years, but on occasions he had seen Dr. Liles; that he had difficulty sleeping due to his nerves; that even if he could have done some light work at the mill, many of the "spare hand" jobs no longer existed in the textile industry due to mechanization and modernization; that he still suffered from chest pains, even when at rest; that he had a severe chest pain the day before the hearing, and one during the previous week; that he was taking five different types of medicine for his heart and chest, one of which was nitro-glycerin; that he had not received unemployment compensation since he stopped working on March 26, 1959.

Mrs. Sadie F. Huneycutt, plaintiff's wife, corroborated the plaintiff's testi-

mony with respect to his heart attacks and his inability to do any work. She stated that plaintiff generally sat around the house, appeared tired, and did nothing except a little work in the garden. Even after doing a small amount of work, or walking a little, she stated that plaintiff got "out of breath," got nervous, and went "all to pieces." In summary, Mrs. Huneycutt stated that she had heard plaintiff's testimony, and that "every word of it was true."

The record contains numerous medical reports from a number of doctors. A report from plaintiff's family physician, Dr. W. L. McLeod, dated October 12, 1958, diagnosed plaintiff's condition as coronary thrombosis. "All" restrictions were imposed by the impairment. Recommended treatment was rest. On December 31, 1959, Dr. McLeod reported a diagnoses of coronary thrombosis and angina pectoris, with continued chest pain. He placed indefinite restrictions on plaintiff's activity. The heart was enlarged moderately, and electrocardiogram showed evidence of an old infarction with insufficiency. On November 11, 1960, Dr. McLeod again reported a diagnosis of coronary thrombosis. Plaintiff was advised to do no work requiring exertion for the reason that activity or stress resulted in dyspnea and angina. He did not think that plaintiff could work at any gainful occupation. On December 27, 1960, Dr. McLeod reported that he was confident plaintiff still had angina which was precipitated by effort or emotional stress, and that he did not think he was able to do any work. On June 9, 1961, Dr. McLeod reported a diagnoses of coronary heart disease with insufficiency, with pain on exertion. It was his recommendation that plaintiff continue to take coronary dilatory drugs and engage in no exertion. On February 12, 1964, Dr. McLeod again diagnosed arteriosclerotic heart disease with coronary insufficiency, which had persisted since September of 1959. He further stated there had been no improvement in five years, and that it was doubtful if the plaintiff would ever improve.

Plaintiff was advised against any exertion.

Dr. George E. Eddins, Jr., in a report dated November 14, 1960, diagnosed plaintiff's condition as coronary occlusion with myocardial infarction. He stated that plaintiff became ill and unable to work in September of 1958, and that his examination had been in consultation with Dr. McLeod. On February 28, 1964, Dr. Eddins again diagnosed a coronary artery disease and advised that plaintiff was experiencing pain in chest, shortness of breath, and heart flutters when walking. His condition was felt to be static. Indefinite restrictions were placed on activity.

Dr. R. V. Liles, Jr., in a medical report dated October 17, 1965, stated he first treated plaintiff on September 26, 1959, and last treated him on October 10, 1965. Diagnoses were arteriosclerotic heart and artery disease with angina pectoris. Dr. Liles concluded that plaintiff had a fair amount of psychological overlay and no motivation, but that he was nevertheless "severely disabled." In another report, dated April 19, 1966, Dr. Liles advised that plaintiff had to cease work on March 26, 1959, because of pain that became severe on exertion, and again diagnosed arteriosclerotic heart disease with angina pectoris.

Dr. J. G. Tuttle, in a report dated January 23, 1960, stated that plaintiff was suffering from shortness of breath and chest pain related to exertion. It was his feeling that plaintiff presented a history compatible with angina, but did not have electrocardiographic changes to substantiate the diagnosis. He observed, however, that the flat T-Wave in Lead I in an electrocardiogram was a little suspicious. This was the only time that Dr. Tuttle ever saw the plaintiff.

In a report dated May 19, 1964, Dr. Logan O. Jones, reported that a diagnosis of arteriosclerotic heart disease was not confirmed by objective findings. No definite industrial hazards or physical limitations were uncovered by the exami-

nation. This was the only time Dr. Jones ever examined the plaintiff.

Upon the foregoing record, Examiner Drury found that the plaintiff had failed to establish by *medically determinable* evidence that he was, at any time on or before June 30, 1964, under a "disability" as that term is defined either before or after the July 30, 1965, amendment to the Social Security Act. In his evaluation of the evidence, the Examiner stated:

> "In order to establish that a medically determinable physical or mental impairment existed as required by the Act, there should be evidence that medically discernible anatomical, physiological, biochemical, or psychological aberrations were present. Allegations of an inability to work, as a result of an impairment such as dyspnea, pain, lack of musculoskeletal function, etc., should be shown to result from structural, physiological or psychological changes which can be identified by the use of clinical, laboratory, or other diagnostic techniques * * *. In this case there is an absence of medically discernible aberrations demonstrative of an incapacitating impairment, or impairments, as verified by specialists in their respective medical fields, during the pertinent period."

The Examiner acknowledged that, according to plaintiff's "subjective accounts," he was "a complete invalid," and "that the subjective account of invalidism [found] considerable support in the reports from * * * [plaintiff's] physician, a general practitioner." It was further found as a fact that the plaintiff experienced "a coronary occlusion with myocardial infarction on or about September 22, 1958." It was concluded, however, that the subjective evidence of pain and disability submitted by the plaintiff and his wife, and the reports of medical examinations made by Dr. McLeod and Dr. Liles depicted " * * * [plaintiff's] case in its most favorable light." The Examiner then goes ahead to point out the absence of a significant number of chest X-rays,

physical examinations, and "electrocardiographic studies." Dissatisfaction was also expressed over the fact that plaintiff's obesity tended to activate his heart condition, and that he had continued to gain weight. The Examiner then quoted from medical articles and textbooks to demonstrate that work tolerance increases with heart patients when anxiety is overcome; that inability to work is often due to unwillingness to work out of fear that work might harm the heart, and that "a vast majority of cardiacs can work." It was then concluded that a careful examination of all the *objective evidence* failed to disclose any support for plaintiff's allegation that he had been "unable to engage in any substantial work during the period from March 26, 1959, through June 30, 1964."

While recognizing that plaintiff's condition might prevent his engaging in "arduous, heavy manual labor," and that plaintiff's "education and employment background [might] not equip him to engage in certain types of work," the Examiner found that the record failed to establish "an impairment so severe as to preclude *any* substantial gainful activity." To support this finding, industrial and governmental studies reported in various publications were cited. No effort was made, however, to point out any specific job opportunities available to the plaintiff in his community.

██ Ordinarily, as earlier noted, judicial review is limited to determining whether there is substantial evidence to support the administrative findings. However, "when the fact-finder has failed to employ the proper legal standard in making [his] determination the finding may not stand." Ferran v. Flemming, 5 Cir., 293 F.2d 568 (1961). Additionally, if the facts have not been evaluated by the Secretary in the light of correct legal standards, administrative findings are not insulated by the "substantial evidence test." Ferran v. Flemming, supra. It is obvious that Examiner Drury denied plaintiff's application on the assumption that "medically determinable" means that opinions or conclu-

sions must be supported by objective clinical findings. In this assumption, he was clearly in error. Branham v. Gardner, 6 Cir., 383 F.2d 614 (1967). Moreover, if "reliance has been placed upon one portion of the record to the disregard of overwhelming evidence to the contrary, the courts are * * * bound to decide against the Secretary." Thomas v. Celebrezze, 4 Cir., 331 F.2d 541 (1964).

The proper elements of proof to be considered in determining the ability or inability of a plaintiff to engage in substantial gainful activities are (1) the objective medical and clinical findings, (2) the diagnoses and expert medical opinion of treating physicians, (3) the subjective evidence of pain and disability testified to by the plaintiff and other lay witnesses, and (4) the plaintiff's education, background, work history, and present age. Underwood v. Ribicoff, 4 Cir., 298 F.2d 850 (1962). Applying these elements of proof to the facts in this case, there can be no question that the subjective evidence of pain and disability testified to by the plaintiff and his wife clearly establish that plaintiff has been totally disabled continuously since March 26, 1959. Dr. McLeod repeatedly diagnosed coronary thrombosis and angina pectoris from October 12, 1958, to February 12, 1964. During this entire period, no improvement was shown in plaintiff's condition, and Dr. McLeod felt that he was unable to engage in any gainful occupation. Dr. McLeod's diagnoses and findings were substantially corroborated by Dr. Liles and Dr. Eddins. All diagnosed an enlarged heart by objective findings. Other doctors only saw plaintiff on one occasion, and were simply unable to support a diagnosis of heart disease by objective clinical findings. The expert judgment of Drs. McLeod, Liles and Eddins is not contradicted by the negative testimony of the other examining physicians. For some unexplained reason, the Examiner acknowledges the correctness of a diagnosis of "coronary occlusion with myocardial infarction" in 1958, but rejects

similar diagnoses by the same physicians on later dates. It is obvious that the Examiner relied solely upon objective medical and clinical findings and totally excluded from consideration the diagnoses and expert medical opinions of treating physicians, the subjective evidence of pain and disability testified to by the plaintiff and his wife, and the plaintiff's education, background, work experience, and age. Since the Examiner erroneously disregarded essential elements of proof, his decision cannot stand. Underwood v. Ribicoff, 4 Cir., 298 F.2d 850 (1962); Redden v. Celebrezze, 4 Cir., 361 F.2d 815 (1966); Hayes v. Gardner, 4 Cir., 376 F.2d 517 (1967).

It is not necessary that the plaintiff be bedridden to come within the provision of the statute. Neither is it necessary that he verbally negative his capacity for, or availability to, each employment opportunity which might be suggested by catalogs or dictionaries which list or contain capsule descriptions of thousands of job opportunities. "Where the statute refers to 'any substantial gainful activity' the word 'any' must be read in light of what is reasonable and not of what is merely conceivable." Thomas v. Celebrezze, 4 Cir., 331 F.2d 541 (1964). The conclusions of the Examiner that plaintiff was physically able to do light work, and that such work was available to him in his community, finds no support whatever in the record.

In summary, the Court is of the opinion, and so finds, that when the requisite elements of proof are considered, the record as a whole overwhelmingly establishes that plaintiff, continuously since March 26, 1959, has been unable to perform any substantial gainful activity by reason of a medically determinable mental or physical impairment which may be expected to result in death or be of long-continued and indefinite duration, and that the record is barren of any substantial evidence to the contrary. Accordingly, the defendant's motion for summary judgment should be overruled

and the plaintiff's motion for summary judgment should be granted.

■ Since the plaintiff took no further action with respect to the Examiner's decision of May 26, 1961, denying his application of December 9, 1959, the Secretary correctly held that "the issues arising within the effective period of said application have thereby become *res judicata*, to the extent that the applicable law has remained unchanged." This does not affect the admissibility of all the evidence with respect to plaintiff's serious heart condition which has existed continuously since March 26, 1959, but will only serve to deny the plaintiff disability insurance benefits before May 26, 1961.

An order will be entered remanding the cause to the Secretary of Health, Education and Welfare with the direction that plaintiff be granted a period of disability and disability insurance benefits to which he would have been entitled had his application of September 16, 1965, been approved.